165 N.J. Super. 392 (1979)
398 A.2d 562
JOHN DOE AND JANE DOE, PLAINTIFFS-APPELLANTS,
v.
STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, DIVISION OF YOUTH AND FAMILY SERVICES, AND W.W. AND R.W., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 1978.
Decided January 24, 1979.
*394 Before Judges FRITZ, BISCHOFF and MORGAN.
Mr. Thomas E. Bracken argued the cause for appellants.
Mr. Robert M. Berman, Deputy Attorney General, argued the cause for respondent State of New Jersey (Mr. John J. *395 Degnan, Attorney General of New Jersey, attorney; Ms. Erminie L. Conley, Assistant Attorney General, of counsel).
No brief was filed and no argument was made on behalf of respondents W.W. and R.W.
The opinion of the court was delivered by BISCHOFF, J.A.D.
This appeal by plaintiffs John and Jane Doe, foster parents of five-year-old D.W., is from an administrative determination of the Division of Youth and Family Services (DYFS) that D.W. should be removed from her foster home and returned to the home of her natural parents. There are important issues presented concerning the procedural and substantive rights of foster parents, natural parents and foster children.
The events which first brought D.W. into the physical custody of plaintiffs occurred in 1974, when D.W. was but eight months of age. On March 27 of that year R.W., the mother of D.W., attempted to murder her by placing D.W. in a sealed garbage bag and leaving her abandoned out of doors. R.W. was indicted for attempted murder. As a result of plea negotiations, R.W. pleaded guilty to an accusation charging her with child cruelty and child neglect. In conformity with the plea bargain an order was entered in the criminal action pending in the Superior Court on September 10, 1975, placing the custody of D.W. in DYFS pursuant to N.J.S.A. 9:6-8.18 "until such time as [R.W.] establishes to the court's satisfaction that she has progressed sufficiently in the course of her psychiatric treatment to again be vested with the custody, control and supervision of the child and the further order of the court." R.W. commenced psychiatric treatment. By an earlier order, dated May 2, 1974, the Juvenile and Domestic Relations Court made D.W. a ward of the court and placed her in the custody of DYFS pursuant to N.J.S.A. 30:4C-12. Although this order is dated May 2, 1974, D.W. had been in the custody *396 of DYFS since early April 1974 and, by DYFS at that same time, placed in the care of plaintiffs, where she has continuously resided to the present time.
These present proceedings were commenced by the filing of a complaint and order to show cause in the Superior Court, Chancery Division, on August 3, 1977. In the complaint plaintiffs named DYFS and the natural parents of D.W. defendants, and plaintiffs sought restraint against increased visitation of D.W. by her natural parents, a termination of parental rights, adoption of D.W. by plaintiffs or, in the alternative, guardianship of D.W.
On August 4, 1977 an order was entered consolidating this matter with the actions previously pending in the Juvenile and Domestic Relations Court and the Superior Court. The order further made D.W. a ward of the court while maintaining her legal custody in DYFS and her physical custody in plaintiffs.
Subsequent orders were entered in the action which: (1) provided for a psychological examination of D.W. and her natural parents; (2) granted limited visitation rights to defendants  which were later increased in both frequency and duration until finally overnight visitation was granted; (3) restrained the natural father of D.W. from exercising any custodial rights; (4) granted the application of DYFS to have a psychiatric examination of D.W.; (5) denied a motion orginally made by DYFS and later made by plaintiffs for the appointment of a guardian ad litem for D.W., and (6) denied the application of plaintiffs to examine the records and files of DYFS, though the court directed DYFS to furnish copies of the reports referred to in (4) above to all counsel.
In support of their various applications for relief, plaintiffs filed with the court affidavits of friends and neighbors of D.W. and of D.W.'s pediatrician. All indicated that D.W. was completely identified  emotionally and psychologically  with plaintiffs as her only family. Also filed with the court was a report of Dr. Lentchner, a psychologist engaged by *397 DYFS to examine D.W. He expressed the opinion that D.W. identified with plaintiffs as her psychological parents and not with her natural parents. He recommended that the custody of D.W. remain with plaintiffs, expressing the opinion that D.W. would be seriously psychologically injured by any parental replacement at this time.
Also before the court was the report of Dr. Santos, a Pennsylvania psychologist engaged by DYFS to examine D.W. He, too, classified plaintiffs as D.W.'s psychological parents, indicating D.W.'s relationship with the natural parents was secondary. He also saw that problems would probably result from any change in D.W.'s parents. The concluding paragraph in the report reads:
Should the court return [D.W.] to her natural parents, the immediate affects [sic] would probably be her reactions from the separation from her psychological parents and family of three years. Her sense of origin and identity can be a problem for both the present and future adjustments. The natural parents feelings and attitudes as well as [D.W.] and other significant people in her life, towards the near tragic separation or rejections can be a difficult and complicated conflict to deal with in the future. The [W's] and [D.W.] with proper support may have the potential to deal with the problems noted above.
DYFS has closely supervised D.W.'s visits with her natural parents and maintained caseworker records and reports concerning the child's adjustment to those visits.
DYFS determined unilaterally in October 1977 that D.W. should be removed from the physical custody of plaintiffs and return to the physical custody of her natural parents. This decision was apparently based upon the cryptic concluding sentence in the report of Dr. Santos, quoted above. Having reached that decision, DYFS made it known to plaintiffs and moved to dismiss plaintiffs' pending action. The motion was granted by the judge for the reason that exclusive jurisdiction of the matter was vested in the Appellate Division. Plaintiffs appealed from the order of dismissal, and we granted plaintiffs' motion for a stay pending appeal.
*398 The natural parents have not participated in any of the proceedings in the Chancery Division or on this appeal.
While the preceding recital has omitted many procedural steps not necessary to the resolution of this appeal, one further proceeding must be mentioned. The original order in the criminal action dated September 10, 1975 retained jurisdiction to review the progress of R.W. following her psychiatric treatment. The order of August 4, 1977 consolidated the criminal action with the proceedings pending in the Chancery Division. Despite that fact and during the pendency of this appeal a motion was filed by R.W. in the criminal action seeking termination of probation and a declaration of her fitness to assume custody of D.W. We are informed that one hearing on this motion has occurred and all further proceedings on the "fitness hearing" in the trial court have been stayed by order of the Supreme Court dated November 21, 1978.
Lurking behind all the procedural maneuverings are the fundamental issues of (1) whether plaintiffs are the psychological parents of D.W. and whether a transfer of D.W. from their custody at this time will cause serious psychological and emotional harm to D.W., Sorentino v. Family & Childrens' Soc. of Elizabeth, 74 N.J. 313 (1977); Sees v. Baber, 74 N.J. 201 (1977); Sorentino v. Family & Childrens' Soc. of Elizabeth, 72 N.J. 127 (1976); Hoy v. Willis, 165 N.J. Super. 265 (App. Div. 1978), and (2) whether the best interests of D.W. require her return to the care, custody and control of R.W., who committed a criminal assault upon her.
This appeal presents complex issues concerning the standing of foster parents to intervene and be heard by DYFS prior to an administrative termination of their relationship with a foster child, the respective rights of natural and foster parents to the custody of D.W., the validity of the administrative decision of DYFS, and the proper method of assuring adequate representation of the child in a proceeding instituted to determine her best interests.

*399 I. JURISDICTION
Plaintiffs contend the trial judge erred in dismissing the complaint for lack of jurisdiction. They argue that the "entire controversy" doctrine precludes Appellate Division jurisdiction and mandates that the case be heard and determined in the Chancery Division. Plaintiffs concede that part of the controversy springs from the administrative determination to remove D.W. from their custody but point to unresolved issues concerning (1) the applicability of the psychological parentage principle and the court's position as parens patriae of all minor children; (2) guardianship, and (3) adoption, and stress the impracticality of holding an evidentiary hearing in the Appellate Division. They therefore argue that the entire controversy belongs in the trial court where a plenary hearing may be held on the unresolved issues.
The case of Pascucci v. Vagott, 71 N.J. 40 (1976), laid this issue to rest. That case concerned the validity of the application of certain welfare regulations. By statute some actions of the director of local welfare boards are reviewable in the Juvenile and Domestic Relations Court. N.J.S.A. 44:1-86. The Supreme Court held that since the case involved an attack on the validity of the action of a state agency, exclusive jurisdiction to review that action was vested in the Appellate Division which, additionally, possessed all original jurisdiction necessary to complete a determination of the matter under review. On the other hand, the court noted that the Juvenile and Domestic Relations Court would be confined in its review because of its limited jurisdiction. The "entire controversy" doctrine was applied by the court to reach the conclusion that review was proper only in the Appellate Division. Id. at 53.
The same principle is applicable here. While the pleadings in the Chancery Division framed the issues in varying terms as a demand for injunctive relief and a violation of various constitutional guarantees, still the core issue of this litigation is the propriety of the administrative decision *400 of DYFS to return D.W. to her natural parents. Jurisdiction to consider an attack on a final administrative determination is vested exclusively in the Appellate Division of the Superior Court by way of appeal. R. 2:2-3(a)(2); Pascucci v. Vagott, supra; W.C. v. P.M., 155 N.J. Super. 555, 563 (App. Div.), certif. den. 75 N.J. 606 (1978). However, rather than dismiss the complaint, as ordered by the trial court, the better practice is to transfer it directly to this court. R. 1:13-4(a).
We will hear the matter as if it had been brought to us by appeal under R. 2:2-3(a)(2), Delaney v. Penza, 151 N.J. Super. 455, 459 (App. Div. 1977), and to the extent that it may be necessary to exercise our original jurisdiction, we will do so.

II. FOSTER PARENTS' STANDING
DYFS contends plaintiffs lack standing to contest its decision to return D.W. to her natural parents and argue that whatever rights plaintiffs may have, they do not include rights to (1) an evidentiary hearing in trial court or any other place, (2) discovery of DYFS documents or reports, or (3) submit for consideration independent psychological examinations of either D.W. or the natural parents.
Plaintiffs, on the other hand, contend that as foster parents they have a constitutionally protected interest, therefore a right, to a plenary hearing with attendant procedural and substantive safeguards prior to the removal of D.W. from their care.
Both parties agree plaintiffs have standing to seek appellate review of the administrative determination of DYFS. We concur. This result is implicit in W.C. v. P.M., supra, where despite the court's holding that the foster parents lacked standing to insist upon a plenary hearing prior to an initial DYFS determination, it nevertheless proceeded to consider the merits of the appeal taken by the foster parents from an adverse administrative determination.
*401 DYFS argues that the case of W.C. v. P.M., supra, is authority for the general proposition that foster parents lack standing to insist upon a plenary hearing before an administrative decision is made to return foster children to their natural parents. We are constrained to disagree with this broad reading of that factually distinguishable case. In W.C. a mother, on June 12, 1974, voluntarily surrendered three children to DYFS for placement in a foster home because of her temporary inability to care for them properly. DYFS placed two of the children with plaintiff foster parents. Plaintiffs executed a form agreement which acknowledged the temporary nature of the placement. The children, ages 8 and 11, at all times were fully cognizant of their relationship to their natural mother and their siblings still residing with the natural mother. Throughout the period of foster home placement, the natural mother maintained contact with her children by frequent visitations and communications. When plaintiffs expressed an interest in the adoption of the two foster children, DYFS replied that it would not support this desire. Upon inquiry by DYFS the natural mother professed an intention and ability to have the children returned to her within the next six months, and she sought the return of her children in October 1977. A psychological examination of the children performed at DYFS' request disclosed no potential for harm were they to be removed from the foster home. DYFS thereafter sought removal. Plaintiffs resisted and litigation resulted.
The Appellate Division held that the foster parents had no standing to object to the administrative decision to remove the children from their care. We do not disagree with that precise holding on the facts presented. However, we do not agree that the sweeping statements in that case suggesting that foster parents lack either standing or protected interests so as to entitle them to "insist upon a plenary hearing as a precondition to a decision" by DYFS concerning the removal of foster children has general applicability to all foster parents in all situations.
*402 Authority for that broad statement in W.C. v. P.M., supra 155 N.J. Super. at 564, is ascribed to the case of Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). That case was the first involving the relative rights and interests of foster parents, vis-a-vis, natural parents, to reach the Supreme Court.[1] Plaintiffs, an organization of foster parents, asserted that the foster family possessed full liberty interests under the Fourteenth Amendment to the United States Constitution and that a foster child could not be removed from the foster family without a prior hearing satisfying due process. They contended that the procedures established in New York for termination of a foster family relationship denied them due process protection.
Smith also involved a voluntary placement of a child with an agreement on the part of the foster parents to return the foster child upon the request of the natural parents. In a lengthy discussion of the social, phychological and legal issues surrounding foster care, id. at 833-838, 97 S.Ct. 2094, the court recognized that the claim of foster parents to a constitutionally protected liberty interest raised "complex and novel questions." Without deciding any of the issues thus identified, the court proceeded to decide the case on the narrow premise that whatever interest was involved, "[a] hearing ... appropriate to the nature of the case" was all that was required. Id. at 848, 97 S.Ct. at 2112. The New York statutes and New York City ordinances attacked required foster parents be given notice of the intention to remove the child and granted them a right to request an independent review of the administrative decision to return the child to the natural family. Also accorded the foster parents were a pre-removal hearing before an official of the *403 Division, representation by counsel, the right to present witnesses, the right of confrontation and cross-examination of witnesses, the right to discovery of the agency's files, a record of the proceedings and a written decision supported by reasons. The statute also provided for a post-removal hearing and judicial review. The Supreme Court found these procedures adequate to protect the interests of the foster parents, whatever they might be. While the court there discussed many of the problems confronting us here, it declined to resolve them.
The procedural protections of the New York City and State statutes far exceed the sparse provisions presently available to foster parents under any New Jersey enactment. Our reading of Smith leads us to conclude it does not hold that foster parents lack standing or a protected interest whereby they are not entitled to be heard prior to an administrative determination concerning the removal of a foster child. See, Note, "Constitutional Rights of the Foster Child," supra, 31 Rutg. L. Rev. at 226.
Moreover, contrary to the contentions of DYFS, W.C. v. P.M. did not foreclose all foster parents from participation in a plenary hearing. The court there said that DYFS was not foreclosed "from providing such a plenary hearing as a matter of discretionary administrative policy." Id. 155 N.J. Super. at 564. It left room for the exercise of administrative discretion when ruling on a foster parent's request to be heard at a plenary hearing. Accepting that test as a sufficient guideline for present purposes, our review of DYFS's denial of plaintiffs' request for a plenary hearing herein requires examination of the record to see if, in the circumstances of this case, there has been an abuse of administrative discretion.
A recent statute adopts a discretionary standard and grants limited standing to foster parents to be heard in a proceeding having as its objective the potential for the removal of children from their foster home. The Legislature, by enactment of the Child Placement Review Act, L. 1977, *404 c. 424, as amended L. 1978, c. 125, N.J.S.A. 30:4C-50 et seq., declared that the purpose of the statute was to provide for both administrative and judicial review of each child's placement outside its home by DYFS in order to insure that each placement is in the best interests of the child. This act lodged broad powers in the Juvenile and Domestic Relations Court to review all voluntary and most involuntary placements of children in foster homes, their removal from the foster homes or changes in their placement. In the discharge of this obligation the court is authorized to hold a hearing to determine whether the placement or change in placement contemplated by DYFS is in the best interests of the child. The statute provides for notice to all interested parties, including the foster parents, if the court determines that the foster parents have information relating to the welfare of the child. N.J.S.A. 30:4C-61. The notice obviously contemplates both an opportunity and standing to be heard.
New Jersey is committed to a liberal approach to the issue of standing, Crescent Pk. Tenants Ass'n v. Realty Eq. Corp., 58 N.J. 98, 107 (1971); Common Cause v. N.J. Election Law Enforcement Comm'n, 74 N.J. 231, 235 (1977), and we see no reason why the standing of foster parents should be determined on a more restrictive basis. Moreover, where parents, natural and foster, do battle with custody of a child as the prize, neither alone may fully represent the best interests of the child. When facts indicate the existence of a bona fide dispute between competing sets of parents grounded in a potential for serious psychological and emotional harm to the very young, the best interests of the child demand a full exposure of the facts prior to any change in custody. That can only be accomplished by granting foster parents and natural parents adversary standing with all the rights which that status implies. Both parties can then present evidence and argument to the adjudicating tribunal, administrative or judicial, for resolution.
*405 Our examination of the portions of the file furnished by DYFS satisfies us that plaintiffs have been loving parents for D.W. Pursuant to placement by a court order they have invested years of care in the nurturing of D.W. The file of DYFS contained opinions from their own experts indicating that there existed a potential for serious psychological and emotional harm following removal of D.W. from the only home she has ever known. This fear is also expressed in some of the reports of the DYFS caseworkers.
Moreover, this was not a voluntary placement by the natural parents, but one based on a court order issued in connection with the criminal proceedings resulting from the criminal assault on D.W. The entire situation embraced such a potential for harm that it should not have been decided upon a cold "investigative and social record." W.C. v. P.M., supra 155 N.J. Super. at 565. In our opinion it was a gross abuse of administrative discretion to refuse to provide standing to plaintiffs and accord them a hearing prior to making the determination to return D.W. to her natural mother.
The opportunity afforded plaintiffs to comment to DYFS workers concerning their objection to the removal of D.W. from their care is of little value if plaintiffs have not been afforded discovery, the right to confront and cross-examine witnesses or present witnesses of their own. In fact, we are informed plaintiffs first became aware of the contents of the DYFS file when it was included as part of its brief and appendix on this appeal.
The record provided us lacks information concerning the experts' background and qualifications and there is no evidence of a searching inquiry into the reasons for the proffered opinion or reports. We are unable to entertain or consider arguments addressed to the bias, competency or credibility of the experts, caseworkers or other witnesses. There is no transcript provided of any hearing. It is clear we are unable to either provide an appropriate appellate review of the administrative determination to return the *406 child to her natural parents, or to exercise our original jurisdiction to resolve that issue.
While in some cases the investigative and social file may provide an adequate record for both an administrative determination and appellate review, W.C. v. P.M., supra at 565, this is not such a case.
We hold that under the circumstances existing here plaintiffs have standing to insist upon a hearing and have the right to discovery, to present witnesses on their behalf and on behalf of D.W., and a right to confront and cross-examine witnesses produced in support of the position of DYFS that there should be a return of D.W. to her natural parents.

III. FOSTER CHILD'S RIGHT TO INDEPENDENT REPRESENTATION
Plaintiffs and DYFS, at some point in the proceedings, argued the best interests of D.W. required the appointment of a guardian ad litem to represent her interests. DYFS has now abandoned that position and argues that under the pertinent statutes it has the power and duty to exercise "care, custody or guardianship" over the children entrusted to its care and that a guardian ad litem is unnecessary since it is acting for and in the best interests of the child. N.J.S.A. 30:4C-4.
Many authorities have expressed the concern that the foster child in custody litigation is frequently the forgotten party. Independent representation of the child has been the suggested answer[2].
This matter of independent representation by counsel, so that children have their own lawyer when their disposition or welfare is at *407 stake, is the most significant and practical reform that can be made in the area of children and the law.
The interests and rights of children are frequently jeopardized in court proceedings because the "best interests of the child" are determined without resort to an independent advocate for the child. Courts may fail to perceive that children will be affected by the outcome of the litigation, or that potential conflicts between the interests of the children and the interests of other parties before the court would require that the child have a separate advocate. More often, the judge assumes that the child's interests are adequately protected by a party already before the court. [Genden, "Separate Legal Representation for Children: Protecting the Rights and Interests of Minors in Judicial Proceedings," 11 Harv. C.R.C.L.L. Rev. 565 (1976); footnotes omitted]
It has been held that in custody litigation the foster child should, as a rule, be represented by separate counsel. In the Interest of Clouse, 244 Pa. Super. 396, 368 A.2d 780, 781 (Super. Ct. 1976). In Smith v. Organization, supra, the trial judge appointed independent counsel for the foster children "to forestall any possibility of conflict between their interests and the interests asserted by the foster parents." 431 U.S. at 821, 97 S.Ct. at 2097. One court, in considering proceedings to terminate parental rights and the right of children to independent counsel, said:
We find that in all termination proceedings there are potential conflicts between the interests of the children and those of both the state and the parents, and thus hold that independent counsel must represent the children in all termination proceedings. We note that this ruling is in conformity with the Uniform Juvenile Court Act adopted by the American Bar Association in 1968 which provides in Rule 26(a) for separate counsel in juvenile proceedings if the interests of two or more parties conflict. [State ex rel. Juv. Dep't of Multnomah Cty. v. Wade, 19 Or. App. 314, 527 P.2d 753, 757 (1974)]
This observation is equally applicable where a dispute arises in the course of foster placement termination.
DYFS contends that it is the proper representative of the child and therefore can be relied upon to advocate the child's best interests. This position is undermined, however, when as *408 here, an agency decision is challenged and that agency in effect becomes an interested party. In a case presenting issues similar to those confronting us, a child care service insisted it was the proper repository of the child's best interests and no independent representation was required. The court remarked:
* * * The assertion of such power is at least troublesome where the Service claims "rights" to the child because the child is neglected but wishes to exercise these "rights" to return the child to the family that once neglected him without a rehearing by the court that entered the original order. [Stapleton v. Dauphin Cty. Child Care Service, 228 Pa. Super. 321, 324 A. 2d 562, 574 (Super. Ct. 1974)]
We deem it unnecessary to attempt to evolve any general rule respecting the appointment of independent representation for the foster child applicable to all cases. In most situations such representation will be unnecessary, for the issue of removal will be resolved without litigation or dispute and with the child's best interests paramount in the consideration of all parties. However, in all cases where it appears from an examination of the agency's own files or from colorably reliable information presented to it that there is a significant conflict in opinion concerning what is in the best interests of the child, or when it appears that the child's best interests are likely to be subordinated to the interests of the parents or DYFS, independent representation is required.
Our review of this record convinces us that the position of the foster parents and DYFS has become so far polarized that independent representation of D.W. becomes an absolute necessity. DYFS has reached a determination to return the child to the natural parents on a record which is ambiguous at best and without any court review or determination concerning the custody orders previously entered. We therefore hold that in further proceedings in this matter a guardian ad litem should be appointed to represent D.W.

*409 IV. HEARING
We have concluded there must be a plenary evidentiary hearing conducted so that a record may be created. The court or agency to conduct this hearing remains to be identified. Normally, any hearing in this context would be conducted by DYFS, the board created for that purpose. However, for reasons previously expressed we conclude DYFS has become so enmeshed in this proceeding as to have lost its ability to instill a feeling of impartiality, fairness and objectivity in those whose rights and interests remain to be determined.
The Child Placement Review Act, N.J.S.A. 30:4C-61, provides that in the event of a dispute between DYFS and the foster or natural parents concerning placement or removal from placement of foster children, a hearing shall be held in the Juvenile and Domestic Relations Court. Although we would normally be guided by that expression of legislative intent, even though this case does not come within that statute, other considerations compel the selection of another forum to hear and decide the issue.
We indicated at the outset that a hearing has been commenced in the criminal proceedings to determine the fitness of R.W. to resume custody and control of D.W. We conclude that the economy of judicial time, as well as considerations of the "entire controversy" doctrine, dictate the selection of the judge assigned to hear the criminal proceedings for the purposes under consideration here[3].
*410 The Supreme Court on November 21, 1978 "ordered that the motion for stay of the trial court fitness hearing is granted pending further order of the court." If and when the stay is lifted, we direct that a plenary hearing be conducted in the Superior Court, Law Division, consistent with the foregoing opinion.
Beyond an inquiry into R.W.'s psychological fitness to resume care of her child, this hearing shall proceed to a determination of what custody decision will be in the best interests of the child. Sorentino v. Family & Childrens' Soc. of Elizabeth, 72 N.J. 127 (1976); 74 N.J. 313 (1977). The ultimate order should reflect careful judicial scrutiny of the competing custody claims in light of the evidence presented. The order should explicitly state the basis for the conclusion reached. Cf. State v. Fields, 77 N.J. 282, 308 (1978).
A word concerning discovery. The questionable validity of the proceedings pending before the Chancery Division judge makes his conservative rulings on discovery understandable. Having here resolved the issue of standing, the pending and paramount issue of psychological parentage requires a more liberal approach to discovery. The trial judge shall therefore have discretion to permit, reject or condition discovery of the records and reports of DYFS, including the ordering of physical examinations of any or all of the parties consistent with the sensitive and emotional nature of the proceedings.
Custody matters should receive priority considerations in scheduling and resolution. We therefore direct that when and if the Supreme Court vacates the stay against the conduct of the "trial court fitness hearing," the hearing ordered *411 herein shall be forthwith scheduled and held and the record, with the judge's findings and conclusions, forwarded to the clerk of this court promptly upon the conclusion thereof.
We retain jurisdiction.
NOTES
[1] See, discussion and analysis of Smith and the issues there raised in Note, "Constitutional Rights of the Foster Child: The Forgotten Party in Custody Adjudication," 31 Rutg. L. Rev. 205 (1978).
[2] Goldstein, Freund and Solnit, Beyond the Best Interests of the Child 65 (1973); Note, "Constitutional Rights of the Foster Child," supra, 31 Rutg. L. Rev. at 205, 216, 225 n. 136, 229 n. 174.
[3] Different facets of the litigation arising from this one factual situation have occupied the time and attention of judges assigned to the Superior Court, Law Division, the Juvenile and Domestic Relations Court and the Superior Court, Chancery Division. This fragmented and overlapping jurisdiction in custody matters with its accompanying waste of judicial time and inevitable delay in determination has been noted and studies have been instituted to investigate the advisability of developing a "family court" to consolidate in one court the jurisdiction necessary to resolve all issues incident to custody matters. See Statement of Judge Simpson, Acting Director, Administrative Office of the Courts, before the Assembly Judiciary, Law, Public Safety and Defense Committee on Assembly Concurrent Resolution No. 38, March 29, 1978; Judge Simpson, "Notice to the Bar," 102 N.J.L.J. 489 (Nov. 30, 1978).