NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF, v. DIEGO TORRES AND ELIZABETH FEDERICI/TORRES, DEFENDANTS, AND RICHARD AND ELIZABETH FEDERICI.

IN THE MATTER OF EVELYN MARIE TORRES AND DIEGO TORRES, JR., MINORS.

IN THE MATTER OF GUARDIANSHIP OF EVELYN MARIE TORRES, MINOR.

Juvenile and Domestic Relations Court
Camden County

October 2, 1980.

*William P. Malloy,* Deputy Attorney General, for the Division of Youth and Family Services, Department of Human Services (*John J. Degnan,* Attorney General of New Jersey, attorney).

*Sue Matney Sadwin* for Diego Torres.

*R. Alan Aslaksen* for Elizabeth Federici/Torres (*Thomas A. Barbera, Jr.* on the brief).

*Barbara Pryor* for Elizabeth and Richard Federici.

*James H. Klein,* law guardian for Evelyn Marie Torres, minor child.

PAGE, P. J. J. D. R. C.

Termination of the parental rights and guardianship of a child is sought by the Division of Youth and Family Services (DYFS) pursuant to *N.J.S.A.* 30:4C–15 and *N.J.S.A.* 30:4C–20. The maternal grandparents have also filed an action seeking custody of the child pursuant to *N.J.S.A.* 2A:4–18(b). The actions were consolidated for trial. This court must determine if the best interests of the child require that her parents' rights be terminated and guardianship awarded to DYFS, and whether the grandparents have independent rights to the custody of their grandaughter which can survive termination of the parents' rights.

Evelyn Marie Torres is the four-year-old daughter of Elizabeth Federici, a/k/a Torres, and Diego Torres. Evelyn has two brothers, ages five and one, and a sister age two and one-half. The parents have never married although they have lived together as husband and wife since before Evelyn's birth.

The abuse to Evelyn began when she was less than two months old. In September 1976 she was hospitalized after an emergency room admission in a local hospital where she had been diagnosed as having a fractured skull, a healed fracture of the tibia and several rib fractures in an early healing phase. Upon release from the hospital the child was accepted for services by DYFS and temporarily removed from her parents

pursuant to court order. Evelyn was then admitted to Children's Seashore House in Atlantic City. During the admission interview the parents claimed that the child had been born with fractures.

On October 4, 1976 the father signed a voluntary agreement allowing DYFS to place Evelyn in a foster care, but shortly thereafter he demanded the child's return. Meanwhile, the staff at Children's Seashore House concluded that Evelyn was "at high risk for potential abuse" and should not be returned to the home. In October 1976 she was discharged from Children's Seashore House and placed in a DYFS foster home.

In February 1977 the mother submitted to a polygraph test on the allegation of abuse to the child. When the test results showed deception, Mrs. Torres was confronted and admitted that she had struck her daughter on the head. Nevertheless, following the recommendations of a psychiatric social worker, the child was returned home under DYFS supervision.

Evelyn was in her parents' home for about seven weeks when a visiting DYFS worker noted several bruises on her forehead. Mrs. Torres said the child had fallen in her crib. A week later she took Evelyn to the hospital with multiple bruises on her forehead, back, abdomen and chest. The child was admitted to the hospital and further examination disclosed a number of "old" bruises on both her cheeks and arms. Once again the parents denied hitting her but stated she had fallen from a bed. In July 1977, just before her first birthday, Evelyn was again placed in a DYFS foster home. In September 1977, at a hearing in the Cumberland County Juvenile and Domestic Relations Court, Evelyn Torres was found to be an abused child and was returned to the custody of DYFS for six months. The judge further ordered that her parents undergo psychological evaluations and begin counseling.

The evaluation showed Mrs. Torres to be "an individual with sufficient emotional difficulties to require a great deal of supportive psychotherapy in learning new control and coping mech-

anisms. She is extremely immature and insecure and as she is unable to deal with her anger in a direct manner, she could become overwhelmed and react in an infantile and global way." Mr. Torres was found to be "rather rigid, overutilizing the defense of the denial."

Overnight visits were initiated between Evelyn and her parents. On several occasions she returned to her foster home smelling of urine and missing patches of hair. On December 21, 1977 a third child, Melissa, was born to Elizabeth and Diego Torres. About a month later the family moved to a larger house which move, it was hoped, would reduce the potential for abuse by placing the family closer to relatives and allowing more space in the home for the parents to escape from the sound of crying.

Evelyn was again ordered returned to her parents in February 1978 with the conditions that Mrs. Torres participate in psychotherapy, that DYFS provide day care for Evelyn and that the child be seen by a pediatrician each month.

Mr. and Mrs. Torres attended a number of therapy sessions between March and May 1978. The reports of these sessions show that the parents were "quite reluctant and evasive in discussing any personal or family problems." The reports did reveal that Mrs. Torres' feelings of rage and helplessness towards her husband were one of the causes of her violence towards Evelyn.

On September 1, 1978 Evelyn was admitted to Cherry Hill Hospital with another skull fracture, a cerebrial concussion, bruises on her elbow, lesions on her forearms and abrasions of her temple and upper lip. Mrs. Torres said the child had fallen and hit her head. She was subsequently released to her parents. Neither DYFS nor the court were informed of this hospitalization at that time.

In March 1979 Evelyn was taken to Cooper Medical Center where doctors found a swelling and defect on the side of the skull and other injuries, bruises and abrasions, including two healed burn areas in the pubic region. The mother first told the

hospital staff that the child had fallen down the stairs. The mother then stated that she had hit the child on her legs with a strap for repeatedly getting out of bed. The mother later admitted she had been awakened several times that night by the father who had gotten out of bed to discipline Evelyn. At one point the mother had to lock herself in the bathroom because she could no longer tolerate the child's crying and screaming from Mr. Torres' beatings.

Mr. Torres told DYFS workers that his daughter had fallen out of bed, rolled under it and hit herself on the underside of the bed. However, he also showed DYFS personnel a leather strap with a buckle which he had used to discipline the child. Mrs. Torres later admitted to Camden police that she hit Evelyn and shoved her into a table causing a gash on her right forehead. The parents then signed a voluntary foster care agreement for their other two children.

While hospitalized, Evelyn was found to have meningitis, anemia and an area of brain atrophy. Skull X-rays showed one extensive right parietal fracture, at least two additional fractures in the right parietal region and a questionable fracture in the left parietal region. She was emaciated and malnourished.

On April 6, 1979 this court signed an order to show cause with preliminary removal for all three children. On May 28, 1979 this court ordered that Evelyn be placed in DYFS custody for 18 months and the other two children returned to their parents under DYFS supervision. The parents were ordered to attend psychological and psychiatric evaluations and therapy. A fourth child was born on July 25, 1979.

The parties entered into a consent order in October 1979, whereby Evelyn was placed with her maternal grandparents, Mr. and Mrs. Federici, with supervised visitation for the parents. Finally, DYFS instituted this action for guardianship in November 1979. The maternal grandparents then filed a complaint seeking custody and the actions were consolidated for trial.

The standard to be applied in guardianship cases is "the best interests of any child" N.J.S.A. 30:4C–15. "Even parental

rights must yield to this principle." *In re Mrs. M.*, 74 *N.J.Super.* 178 (App.Div.1962). It must be shown by clear and convincing evidence that "the child's best interests will be substantially prejudiced if he is permitted to remain with his parents—*i.e.*, that his health and development have been or probably will be impaired and that the parent is unlikely or unwilling to change, or that the parent is in some way incapable of caring for the child or unwilling to do so." *In re Cope*, 106 *N.J.Super.* 336, 340–41 (App.Div.1969), *In re B.C.H. Guardianship*, 108 *N.J.Super.* 531, 537 (App.Div.1970).

This child is clearly the "scapegoat" for the frustrations of both parents in dealing with her and each other. *Fontana, The Maltreated Child*, at 26 (1977). See also *Kempe & Kempe, Child Abuse* (1978); Zalba, "The Abused Child: I. A Survey of the Problem," 11(4), *Social Work* 3 (1966). Her mother and father have been responsible, individually and collectively, for severely fracturing her skull at least three times. The multiple beatings have resulted in numerous other injuries throughout her short but violent life. At the very least, each parent failed in their duty to the child to try to stop the brutal punishment.

In addition to her physical injuries, this child did not receive the minimum degree of care required for adequate nourishment and medical needs. Each parent was responsible for at least one of the beatings and for the failure to get adequate and immediate medical care for the resulting injuries.

The fundamental principle that a child should grow up with its natural parents does not govern in cases of extreme abuse. Evelyn Torres has been the victim of such extreme and continued abuse at the hands of both parents that if she returns to them the abuse will probably continue. Even after she was placed in foster care and spent only week-ends with her parents, they were unwilling or unable to take proper care of her and refrain from physically abusing her. The parents appear unwilling or unable to change or be rehabilitated as to their treatment of this child. This court will not subject Evelyn to further

physical abuse by her natural parents. Termination of the parental rights of Evelyn Federici-Torres and Diego Torres to their daughter Evelyn Marie Torres is in the child's best interests, by very clear and convincing evidence and beyond all reasonable doubt.

■ Having determined that termination of parental rights is necessary, it follows that guardianship is awarded to DYFS for all purposes, including the placement for adoption. *N.J.S.A.* 20:4C–20. This award of guardianship requires a ruling on the actual custody of the child pending further proceedings.

■ DYFS receives unconditional authority as legal guardian under *N.J.S.A.* 30:4C–20, to 22. If this guardianship were to restrict the court's power to award custody to the Federicis it would be in conflict with other statutes governing treatment of children. The stated legislative purpose for creating this court is:

> ... to secure for each child coming under the jurisdiction of the juvenile and domestic relations court such care, guidance and control, preferably in his own home, as will conduce to the child's welfare and the best interests of the state; and when such child is removed from his own family, to secure for him custody, care and dicipline *as nearly as possible equivalent to that which should have been given by his parents. N.J.S.A.* 2A:4–2. [Emphasis supplied]

In this case the care which is closest to that of the natural family flows from the child's relationship with her maternal grandparents. Although the courts and Legislature of this State have declared that a grandparent may have rights independent from those of the parents, the extent of those rights and the grandparents' standing in this action have been challenged. The grandparents are clearly "interested parties" in this case and must be given an opportunity to obtain relief in a court in their prayer for custody.

The anticipated creation of a family court would seem to resolve procedural issues which were raised in this case. A court with broad jurisdiction to decide all the issues surrounding the interests of children and their extended families could best resolve the questions presented here. *See Doe v. State* 165 *N.J.Super.* 392, 409, n.3 (App.Div.1979).

In opposing consolidation both counsel for the parents rely on the language of *J. v. M.*, 157 *N.J.Super.* 478, 494 (App.Div.1978), that states, "a grandparent's right to custody or even to visitation can rise no higher than those of the natural parents." In that case the grandparents filed suit for custody of their daughter's unborn child, while the parents were incarcerated for the manslaughter of one of their children and the abuse of another. DYFS intervened, was granted temporary custody and then sought termination of parental rights and authorization to consent to the child's adoption. The child was placed with foster parents, with whom she lived for 2½ years preceding trial. At trial there was extensive testimony regarding the detrimental effects that separation from her foster parents would have on the child. Moreover, the trial judge found that the natural parents showed little likelihood for rehabilitation. Despite evidence indicating that the grandparents sought custody to enable the natural parents to eventually gain custody, the trial court refused to sever the parental ties and awarded custody to the grandparents. The Appellate Division reversed, finding the natural parents unfit and terminated parental rights.

The court in *J. v. M. Id.* considered the grandparents' situation: they were 69 and 65 years of age; the natural mother had lived with them since her release from prison; their motive for seeking custody was to return the child to her natural parents; the child had not been living with them but had developed a loving relationship with a foster parent and, in fact, the grandparents had never seen the grandchild. The issue in *J. v. M.* was *not* whether the grandparents had standing to file for custody, but whether they were entitled to custody which could eventually be turned over to their children, whose parental rights had already been terminated.

The Federici's position is very different from that of the grandparents in *J. v. M.* Evelyn has been living with them for over a year. The love and care derived from the relationship between the Federicis and Evelyn is very apparent to this court.

The Federicis are in their mid-fifties and still have four of their ten children living at home. These children are 25, 18, 14 and 8 years of age and provide a valuable extended family for Evelyn. She is now a happy child who seems content to stay in their loving care. A parent-child psychological bond is developing between them, a bond recognized and encouraged in the courts of this state. *Sorentino v. Elizabeth Family & Children's Society*, 74 *N.J.* 313 (1977) (*Sorentino* II); *In re J.R. Guardianship*, 174 *N.J.Super.* 211 (App.Div.1980). The DYFS worker who interviewed the family described them as warm and cohesive and their homelife as low-keyed and tranquil, ·in marked contrast to Evelyn's violent life since birth. After their own investigation of the Federici home, DYFS personnel agreed with this placement for Evelyn.

These grandparents filed for custody *after* DYFS filed its petition for guardianship pursuant to *N.J.S.A.* 30:4C–15. The statute reads, in pertinent part:

> Whenever . . . (c) it appears that the best interests of any child under the care or custody of the Bureau of Childrens Services require that he be placed under guardianship . . . a petition, setting forth the facts in the case, may be filed with the juvenile and domestic relations court. . . . *A petition* as provided in this section *may be filed by any person* or any association or agency, interested in such child. . . . . [Emphasis supplied]

The grandparents, as persons interested in the child, may certainly file a petition for guardianship. The issue here is whether their action for custody can be consolidated with DYFS' action for guardianship.

Because of the factual and procedural differences between the two cases, the result in *J. v. M.* is not controlling. The language in *J. v. M.*, relied upon by counsel for Diego Torres and Elizabeth Federici Torres, that "a grandparent's right to custody, or even to visitation, can rise no higher than those of the natural parents," is directly contrary to our Supreme Court's statement in *Mimkon v. Ford*, 66 *N.J.* 426, 432 (1975), that a grandparent's right to visitation is an independent one, and to *N.J.S.A.* 9:2–7.1 which authorizes visitation rights for grandparents when the parents are deceased, divorced or separated.

The reasoning of *J. v. M., supra,* was relied upon in *D.Y.F.S. v. D.T. and J.T.,* 171 *N.J.Super.* 520 (J.D.R.C.1979), where the trial court held that grandparents were not entitled to intervene in an action to terminate the parental rights of their children. The court ruled (at 524) that where the parents' rights are severed, the grandparents are thus eliminated from consideration for custody of the children. There, the paternal grandparents had also never seen the children and the maternal grandmother had seen them only when accompanying the mother at visitation. The court found "No useful purpose would be served by allowing these grandparents—maternal and paternal—to intervene. Permission to intervene was therefore denied." *Id.* at 525. The court did allow the children's foster parents to intervene, as the children had resided with this family, noting:

Where the court believes that anyone, including foster parents, has information which would be helpful in determining what is in the best interests of the children, that person or persons should be permitted to testify. The foster parents were therefore allowed to intervene and present testimony as to the best interests of the children. [*Id.* at 526]

The trend in New Jersey case law is to allow "foster parents to be heard in a proceeding having as its objective the potential for the removal of the children from their foster home." *Doe v. State, supra* 165 *N.J.Super.* at 403. *See also, Smith v. Organization of Foster Families,* 431 *U.S.* 816, 97 *S.Ct.* 2094, 53 *L.Ed.2d* 14. This judicial trend receives support from New Jersey's Child Placement Review Act of 1977, *N.J.S.A.* 30:4C–50 *et seq.,* which requires notice of proceedings to foster parents as interested parties. *N.J.S.A.* 30:4C–61. "The notice obviously contemplates both an opportunity and standing to be heard." *Doe v. State, supra* 165 *N.J.Super.* at 404. *R.* 4:33–2 allows a party to intervene in an action at the discretion of the trial judge. A court should be liberal in granting intervention. *State v. Lanza,* 39 *N.J.* 595 (1963). The trial court should consider whether intervention will eliminate subsequent litigation. *Monsanto v. Leeds,* 130 *N.J.Super.* 245 (Law Div.1974).

The Federicis are both grandparents and foster parents to Evelyn and have information which is pertinent to the court's

determination. In addition, intervention now may preclude future litigation. In the interest of accuracy and judicial economy, Mr. and Mrs. Federici were permitted to intervene in DYFS' guardianship action with their own petition for custody.

New Jersey and other jurisdictions recognize the unique character of grandparents' love for their grandchildren. *Mimkon v. Ford, supra; Hooks v. Ellerbe*, 257 *Pa.Super.* 219, 390 *A.2d* 791 (1978); *Stuckey v. Stuckey*, 276 *So.2d* 408 (La.Ct.App.1973). *In Mimkon* the court noted that grandparents may be "generous sources of unconditional love and acceptance." *Id.* 66 *N.J.* at 436. Furthermore,

> It is biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. *A very special relationship often arises and continued between grandparents and grandchildren.* [*Id.* at 437; emphasis supplied]

The court then recognized the "devotion to the grandchild that merits the grandparent's continued right to be with him." *Id.* at 437.

■ The statute, *N.J.S.A.* 9:2–7.1, changes the common law rule which denied visitation based on the fact that "judicial enforcement of grandparent visitation rights would divide proper parental authority and the child might be forced into a conflict between the parents and grandparents." *Mimkon, supra,* 66 *N.J.* at 431. Obviously, there are no such considerations in a custody matter where the rights of the parents have been terminated. While *Mimkon* and *N.J.S.A.* 9:2–7.1 both concern visitation, not custody, these authorities indicate a broad recognition of grandparents' rights. In fact, there is no common law prohibition against grandparents having custody. See 23 *St. Louis Univ. L. J.* 643, 647, 648 (1979).

■ Recent cases no longer adhere blindly to rigid rules of independent vs. derivative rights. In finding grandparents' rights either derivative from parents rights or independent of them, the deciding factor is the grandparents' actual relationship with the grandchild. Where grandparents have a direct,

personal relationship with the grandchild, their rights are found independent of the parents' rights.

Other jurisdictions also acknowledge such rights. In *Wilson v. Family Services Div., Region Two*, 554 *P.2d* 227 (1976), the Supreme Court of Utah rejected the notions that grandparents have no enforceable legal rights to the custody of a grandchild.

> ... [A]lthough the parents of a child are the only ones who have a direct and vested right to his custody, ... next of kin, such as this grandmother, do have some dormant or inchoate right or interest in the custody and welfare of children who become parentless, so that they may come forward and assert their claim; and ... even though this does not rise to the dignity of an absolute legal right, it is a legitimate interest of such a nature that it should strongly commend itself to serious consideration.... [*Id.* at 230].

Also, in *Matter of Jennings*, 32 *Ill.App.*3d 857, 336 *N.E.*2d 786 (App.Ct.1975), the court ruled the grandmother had standing to petition for guardianship, as she had "a special interest in the outcome of these proceedings." *Id.* at 860, 336 *N.E.*2d 788. See, also, *Tiffany on Domestic Relations* (3 ed. 1921), § 148 at 395; 39 *C.J.S., Guardian & Ward* § 6 at 18.

Sociological texts have long recognized the invaluable role that grandparents can play in the lives of their grandchildren. "Since most children are fond of their grandparents and know that they are loved by them, they gain the security necessary for wholesome development." *Mackenzie, Parent and Child*, at 33 (1949). *See*, also, *Groves, Skinner and Swenson, The Family and its Relationships*, at 368 (1948); *Turner, Family Interaction*, at 437 (1970); *Duvall, Family Development*, at 425 (1971).

■ Evelyn Torres is settled at last in a home where she receives the kind of love and care that she needs. This court finds the best interests of Evelyn Torres require that she remain in the custody of her maternal grandparents. The court recommends further proceedings toward her adoption by them.

The court will sign an appropriate order in accord with the provisions of this opinion.