641 A.2d 1118

IN THE MATTER OF THE GUARDIANSHIP
OF T.M.B. AND R.C.B., MINORS.

K.D.D., C.E.D., FOSTER PARENTS OF T.M.B. AND R.C.B., INFANTS, INDIVIDUALLY, AND AS GUARDIAN AD LITEM FOR T.M.B. AND R.C.B., PLAINTIFFS, v. NICHOLAS R. SCALARA, DIRECTOR OF NEW JERSEY YOUTH AND FAMILY SERVICES, THE NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, SUSSEX COUNTY DIVISION OF FAMILY SERVICES, D.A.B. AND J.K., DEFENDANTS.

Superior Court of New Jersey
Chancery Division Family Part
Sussex County

Decided December 13, 1993.

*Geraldine O. Livengood,* Deputy Attorney General, for the Division of Youth and Family Services (*Fred DeVesa,* Acting Attorney General of the State of New Jersey).

*Cynthia Gehring,* for D.A.B. (*Morris, Downing & Sherred,* attorneys).

*James Opfer,* for J.K.

*Gary Kraemer,* Law Guardian for T.M.B. and R.C.B. (*Daggett & Kraemer,* attorneys).

*Emily Arnow Alman,* for K.D.D. and C.E.D. (*Alman S. Michaels,* attorneys).

PARKER, J.S.C.

In this case, the Division of Youth and Family Services seeks to terminate the parental rights of D.A.B. and J.K., the parents of T.M.B., born August 17, 1989, and R.C.B., born June 28, 1991.

The children's foster parents, K.D.D. and C.E.D., have filed a separate complaint for termination of D.A.B.'s and J.K.'s parental rights, for guardianship and adoption of the children and for enforcement of the children's constitutional rights of equal protection.

DYFS, the parents and the children's law guardian have moved to dismiss the foster parents' complaint for lack of standing. After considering the briefs and arguments of counsel, the court finds that the foster parents lack standing to pursue their complaint. Their complaint is dismissed without prejudice.

## PROCEDURAL HISTORY

The relevant procedural background is as follows: on October 16, 1989, when T.M.B. was two months old, the Division placed her in foster care with K.D.D. and C.E.D., pursuant to a foster care agreement. On April 4, 1991, DYFS filed a complaint for termination of parental rights.

On July 2, 1992, DYFS filed a complaint for protective services of R.C.B., who was then four days old. On that same date, an order to show cause with preliminary removal was entered and the next day R.C.B. was placed in foster care with K.D.D. and C.E.D. along with his sister. On June 17, 1992, DYFS filed an amended complaint for termination of parental rights to include R.C.B. The children have remained in foster care with K.D.D. and C.E.D. since their initial placement while the case proceeded.

It is not relevant to this motion to set forth the details of the proceedings between the filing of the termination complaints and June 4, 1993, except to state that for a substantial period of time prior to June 4, 1993, D.A.B. engaged in regular, supervised visits with the children. On June 4, 1993, after considering recent evaluations of D.A.B., the court ordered that visitation be expanded and that supervision be diminished gradually. The court indicated that if the expanded visitation went well, the Division should develop a plan whereby the children could visit with the birth mother overnight.

On July 2, 1993, the Division Director, Nicholas R. Scalara, wrote to the foster parents, stating:

Since the precedent setting New Jersey Supreme Court decisions in July 1992, ... [DYFS] has experienced an increase in the number of cases in which our Family Court petitions for termination of parental rights have been denied. The Supreme Court decisions strongly uphold the rights of biological parents. As of this date, we simply do not have the grounds necessary to permanently sever parental rights. It now appears that the goal is for the children to be reunited with their mother....

After announcing to the foster parents the Division's administrative decision to change the goal from termination to reunification, the Division took no action to withdraw the termination complaint and no orders were entered affecting custody or placement of the children. Nevertheless, on July 28, 1993, the foster parents filed their complaint for termination, guardianship and adoption of the children. At the same time, they applied for an order to show cause to stay "enforcement of the order of removal" of T.M.B. and R.C.B. from their home. The application for the order to show cause was denied in its entirety because (1) the application was premised on an incorrect assumption that such an order had been entered; (2) a hearing had already been scheduled before the Child Placement Review Board at the foster parents request; and (3) the foster parents demonstrated no immediate and irreparable harm to the children or themselves because the status quo with respect to custody had been maintained. The court did, however, consolidate the foster parents' complaint with the guardianship complaints in an order entered on July 29, 1993, to avoid having the complaints litigated independently of each other and the possibility of having conflicting orders entered.

On September 8, 1993, the foster parents applied for an order to show cause with temporary restraints to restrict expanded visitation between the children and the birth mother. At a hearing on that date, the order to show cause was denied but the court ordered bonding evaluations of the birth mother, the children and the foster parents and a further evaluation to determine whether the expanded visitation was harmful to the children as alleged by the foster parents.

The matter was scheduled for trial on December 6, 1993. On that date, all parties appeared. DYFS, the birth parents and Law Guardian moved to dismiss the foster parents' complaint for lack of standing. The court heard the parties' oral arguments that day and directed them to file briefs on the issue by Friday, December 10, 1993.

On December 6, 1993, however, the parties were ready to try the case and the first of the Division's expert witnesses was present. The court decided to go forward, pending determination of the standing issue, to avoid any further delay. With the consent of the parties, the court permitted counsel for the foster parents to be present during the expert's testimony and to cross-examine him, subject to striking all testimony from the cross-examination if the foster parents were found to lack standing. The court permitted counsel for the foster parents to cross-examine the expert for the purely practical reason of not having to recall the expert and further delaying the proceedings in the event the foster parents were found to have standing. The foster parents, themselves, were sequestered from the courtroom, along with all other witnesses.

## THE PARTIES' CONTENTIONS

DYFS argues that the foster parents, although genuinely concerned for the children, are "legal strangers" to them because the statutory and case law do not vest any legal rights in the foster parents. The Division notes that *N.J.S.A.* 30:4C–26.7 specifically provides that foster parents who have cared for a child for two or more years may apply for adoption "*if* said child is eligible for adoption" (emphasis added). Moreover, the Division argues that it, alone, has the statutory authority to seek guardianship of the children for the purpose of placing them for adoption. The mother, father and law guardian join in the Division's arguments.

The birth mother additionally argues that if the foster parents were permitted to join the action at this juncture, the birth mother will not only be required to defend the DYFS termination com-

plaint but will have to prove she is better able to parent the children than the foster parents. In essence, the birth mother argues that a termination case is not a custody dispute pitting her against the foster parents.

The foster parents contend that they have standing to pursue a complaint for termination and adoption simultaneously with DYFS by virtue of Title 30, chapter 4C, and Title 9, chapter 3, and caselaw. They argue that *N.J.S.A.* 30:4C–61(b)(2) enables the court to conduct a hearing "concerning child placement" if "a party entitled to participate in the proceedings requests a hearing." The foster parents claim to be "entitled" parties because *N.J.S.A.* 30:4C–61(c)(5) requires notice of such hearing be provided to "the temporary caretaker of the child."

They further contend that standing is conferred by *N.J.S.A.* 30:4C–26.5, which prohibits DYFS from compelling foster parents to sign agreements waiving their right to seek adoption; *N.J.S.A.* 30:4C–26.7, which requires that a child sought by foster parents for adoption must have resided with them for a least two years; *N.J.S.A.* 30:4C–26.8, which allows "any person" who receives a child into his or her home to institute an action for adoption; *N.J.S.A.* 9:3–45 and 48, which permits intended-adoptive parents to file a complaint for adoption and allows the Court to terminate parental rights; *N.J.S.A.* 9:3–43, which allows "any person" to institute an action for adoption; and *N.J.S.A.* 30:4C–14, which permits "any person" to file a complaint for guardianship.

The foster parents also rely on a number of cases in support of their position, particularly *Doe v. State,* 165 *N.J.Super.* 392, 398 A.2d 562 (App.Div.1979), and a recent Appellate Division decision, *In the Matter of the Guardianship of J.T.,* 269 *N.J.Super.* 172, 634 A.2d 1361 (App.Div.1993). They maintain that they have standing because they are "uniquely equipped to raise the 'special needs' of the children" and are the only parties who will represent the children's best interests.

The foster parents also now argue that they are entitled to standing because their character was "attacked" by the expert

witness whose testimony their attorney was permitted to cross-examine, pending a decision on the standing question. Counsel for the foster parents was permitted to participate in the direct and cross-examination of the expert because all parties consented to the condition that the testimony would be stricken if they were found to lack standing. Thus, the foster parents knew from the commencement of the trial that they would be excluded if they lacked standing. Their conditional participation cannot, in itself, confer standing where none otherwise existed.

As to the allegation that the expert witness "attacked" their character, that is a gross distortion of the expert's testimony. The testimony referring to the foster parents was properly focused on whether they may have undermined the birth mother's relationship with the children or impeded the birth mother's ability to demonstrate adequate parenting skills. The expert's testimony—even if it were an "attack" on the foster parent's character, which it was not—cannot confer standing in this proceeding.

## DISCUSSION

Title 30, chapter 4C, of New Jersey Statutes establishes a statutory scheme whereby DYFS is designated as "the State agency for the care, custody, guardianship, maintenance and protection of children." *N.J.S.A.* 30:4C-2(a). The Division is authorized to file a petition for guardianship under *N.J.S.A.* 30:4C-15 where it has made diligent efforts but failed for a period of one year "to remove the circumstances or conditions that led to removal or placement of the child."

The foster parents point to *N.J.S.A.* 30:4C-15 as authority for them to file a petition for guardianship simultaneously with DYFS because the statute says "any person" interested in the child may file. The statute, however, states: "any person *or* any association *or* agency interested in such child ..." (emphasis added) may file a guardianship petition under the circumstances set forth. If the Legislature intended to allow simultaneous actions for termination of parental rights, it would have used the

conjunctive "and" rather than the disjunctive "or" in the statute. Section 15 cannot be read to authorize the foster parents to prosecute their claim for guardianship when the Division is already doing so.

Moreover, in *In re Adoption of Two Children by A.M. & L.M.*, 170 *N.J.Super.* 320, 406 *A.2d* 468 (App.Div.1979), the Appellate Division severely criticized the foster parents for pursuing a separate action for adoption while DYFS was proceeding with a guardianship case. There, as in the present case, parental rights had not been terminated and the children had not been placed for adoption. The court stated:

> The mere conclusion by DYFS that parental rights ought to be terminated does not *per se* entitle it to 'authorize or approve the institution of adoption proceedings by the foster parents.

[170 *N.J.Super.* at 330, 406 *A.2d* 468.]

The entire statutory scheme of Title 30, chapter 4C, clearly intends that DYFS, as the State agency, fully comply with all of the statutory and procedural requirements *before* parental rights may be terminated and children placed for adoption. To allow foster parents to proceed simultaneously would thwart the statutory scheme and turn every termination case into a custody battle. The birth parents would then be required to prove not only that they are fit parents, but that they are more fit than the foster parents. That is clearly not the standard for termination of parental rights. *N.J.S.A.* 30:4C–15.1; *New Jersey Div. of Youth and Family Services v. A.W.*, 103 *N.J.* 591, 512 *A.2d* 438 (1986).

In *A.W.*, Justice O'Hern noted that a great majority of neglect cases involve

> parents [who] can be described as extremely "marginal" people, that is they are continually at the borderline of being able to sustain themselves—economically, emotionally and mentally.
>
> ....
>
> Such parents may provide little emotional support for their children. While the children may not be physically abused, left unattended, dangerously malnourished, or overtly rejected, they may receive little love, attention, stimulation, or emotional involvement.

. . . .

. . . parental "inadequacy" in and of itself should not be the basis for intervention

. . . .

103 *N.J.* at 606 n. 8, 512 *A.*2d 438. If foster parents were permitted to pursue their own claim for termination and adoption simultaneously with a DYFS termination case, "marginal" parents would be at a decided disadvantage. "An action to terminate parental rights cannot be allowed to become a custody contest." *D.Y.F.S. v. D.T. and J.T.,* 171 *N.J.Super.* 520, 524, 410 *A.*2d 79 (J. & D.R.Ct.1979).

■ The foster parents' arguments with respect to other sections of Title 30, chapter 4C, and Title 9, chapter 3, similarly misread the statutory intent. *N.J.S.A.* 30:4C–26.7 clearly and unequivocally states that foster parents, who "have cared for a child a child continuously for . . . two (2) years or more, may apply to the [Division], for . . . adoption and *if* said child is eligible for adoption, the [Division] shall give preference and first consideration to their application over all other applications for adoption placements" (emphasis added). This section does not give foster parents the right to adopt children after two years *unless* and *until* the children are eligible for adoption. *A.M., supra,* 170 *N.J.Super.* at 328, 406 *A.*2d 468.

In *W.C. v. P.M.,* 155 *N.J.Super.* 555, 565–66, 383 *A.*2d 125 (App.Div.1978), *cert. denied* 75 *N.J.* 606, 384 *A.*2d 836 (1978), the Appellate Division stated:

> To surround a foster parent with greater rights than those contemplated by the legislative system would permit them to interfere with the delegated function of the Division and the paramount right of the parent to the re-entry of the children into the natural family unit. In fact, such indulgence toward foster parents would tend to destroy the entire system of foster care by creating an impediment to the voluntary consent of an unfortunate parent who cannot care for the children because of health, economic reasons or other infirmities, but who nevertheless has a sincere interest in the welfare of her children and the ultimate return to the family fold. Such an approach would also obliterate the well-settled dichotomy in the legislative system of our State between the placement of a child for adoption and the placement for foster care. See *N.J.S.A.* 30:4C–26.4. In the former the parties know and expect the termination of parental rights. In the latter the parties know and expect temporary placement looking toward return of the children to the natural parent.

The foster parents' contention that the adoption provisions of Title 9, chapter 3, authorize them to pursue an adoption claim prior to termination of parental rights is also unfounded. While *N.J.S.A.* 9:3–43 allows "any person" to institute an action for adoption, nothing in the adoption statutes can be read to authorize the foster parents to proceed without the birth parents' consent for adoption or a court ordered termination of parental rights where the adoptive parents received the children through foster placement. *N.J.S.A.* 9:3–47 permits the foster parents to file a complaint for adoption, absent parental consent or a termination order, *only* if DYFS (or an authorized agency) fails or refuses to consent to the adoption. Such consent presumes the child is eligible for adoption.

The foster parents' reliance on *Doe v. State, supra,* 165 *N.J.Super.* 392, 398 *A.*2d 562, and the recent decision in *J.T., supra,* 269 *N.J.Super.* at 172, 634 *A.*2d 1361, is misplaced. Neither of those cases can be construed to obviate the statutory scheme. In *Doe,* the Appellate Division approved standing for foster parents to be heard in the very limited circumstance where DYFS had decided administratively to change the child's placement. The court held that *N.J.S.A.* 30:4C–50 to –65 which authorizes a hearing "to determine whether the placement or change in placement contemplated by DYFS is in the best interests of the child...." and requires notice to all interested parties, "... obviously contemplates both an opportunity and standing to be heard." 165 *N.J.Super.* at 404, 398 *A.*2d 562.

The circumstances in *Doe,* however, were distinctly different from the present case. There the child had been removed from the birth parents by a criminal court order upon the mother's indictment for attempted murder of the child and subsequent guilty plea to charges of child cruelty and neglect. The criminal court order directed DYFS to place the child in foster care "until such time as [the birth mother] establishes to the court's satisfaction that she has progressed sufficiently in the course of her psychiatric treatment to again be vested with the custody, control

and supervision of the child and the further order of the court." *Id.* at 395, 398 *A*.2d 562. A complaint for protective services was then filed. Three years later, when DYFS administratively decided to return the child to her birth parents the Appellate Division held that the foster parents had standing to be heard pursuant to *N.J.S.A.* 30:4C–61.

Here, DYFS is now aggressively pursuing its guardianship complaint, notwithstanding its earlier indication that the goal would be changed from termination to reunification. DYFS made no attempt to withdraw its termination case and no order was entered changing the children's placement. Accordingly, the hearing and notice provisions of *N.J.S.A.* 30:4C–61(b) do not apply.

In *J.T.*, the Appellate Division did not address the question of standing for the foster parents but merely noted that "the foster mother was permitted limited intervention." 269 *N.J.Super.* at 180, 634 *A*.2d 1361. There too, the circumstances were significantly different from the present case in that the trial court had already tried the termination case and "was not satisfied that DYFS had established by clear and convincing evidence that other reasonable alternatives to termination of the mother's parental rights had been considered by DYFS." 269 *N.J.Super.* at 179, 634 *A*.2d 1361. Here, the termination case has just begun and the Court has made no determination on its merits.

In *Smith v. Organization of Foster Families*, 431 *U.S.* 816, 846–47, 97 *S.Ct.* 2094, 2111, 53 *L.Ed.*2d 14 (1977), the United States Supreme Court discussed the rights of foster parents *vis a vis* the rights of natural parents and stated:

It is one thing to say that individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they have freely entered, even in the absence of biological connection or state-law recognition of the relationship. It is quite another to say that one may acquire such an interest in the face of another's constitutionally recognized liberty interest that derives from blood relationship, state-law sanction, and basic human right—an interest the foster parent has recognized by contract from the outset. Whatever liberty interest might otherwise exist in the foster family as an institution, that

interest must be substantially attenuated where the proposed removal from the foster family is to return the child to his natural parents.

In *Smith*, the Supreme Court addressed foster parents' standing in the narrow context of New York State statutes. *Smith* cannot be read to grant standing to the foster parents in this case.

## CONCLUSION

The foster parents have not established a legal basis for standing to pursue their claim for termination of parental rights, guardianship and custody of the children. This court has no doubt that they are acting on their sincere belief that the children's best interests can only be served by allowing them to proceed. Nevertheless, the court must adhere to the statutory scheme which requires that a determination of parental rights be made first before the child is eligible for adoption.

DYFS is pursuing the termination case and the children are represented by a law guardian. DYFS has indicated that it intends to call the foster parents as witnesses. If it does not do so, the court will, because their testimony will be relevant on two of the four standards for termination, namely whether there are alternatives to termination and whether termination will not do more harm than good. *N.J.S.A.* 30:4C–15.1; *A.W., supra,* 103 *N.J.* at 591, 512 *A.2d* 438.

This court is mindful that determination of children's best interests and termination of parental rights are among the most awesome powers of the court. These decisions are not made lightly, legalistically or in ignorance of the very real and painful emotions of all parties. Solomon, in his wisdom, called for a sword to resolve the dispute between two mothers. This court possesses no sword but it will do its best with what it has to determine the best interests of these two children.