**Pablo RODARTE, a/k/a Anthony Trevino and Rosa Trevino, Appellants,**

v.

**Elton COX and Wife, Betty Cox, Appellees.**

No. 12-88-00067-CV.

Court of Appeals of Texas, Tyler.

Dec. 13, 1991.

Rehearing Denied April 27, 1992.

Robert E. Norris, Elizabeth Brice, Nacogdoches, for appellants.

Tom P. Senff, Tom D. Rorie, Nacogdoches, for appellees.

BILL BASS, Justice.

This is an appeal from a judgment terminating the parental rights of Pablo Rodarte a/k/a Anthony Trevino, and Rosa Trevino in relation to their daughter, Jessica Trevino. We affirm the judgment.

When Jessica was four weeks old, she became sick and her mother, Rosa Trevino, took her to Dr. Barry Roberts. Dr. Roberts noted that Jessica had diarrhea, diaper rash and "failure to thrive, probably on the basis of inadequate caloric intake." Dr. Roberts ordered the child hospitalized and notified the Texas Department of Human Services (hereinafter "TDHS") of what he considered probable parental neglect. Initially, Jessica gained weight in the hospital, but on the fifth day of her stay, tests revealed a staphylococcus infection of the urinary tract. She remained acutely ill for five more days. At her discharge from the hospital on June 30, 1984, Dr. Roberts included in his discharge summary, "apparent emotional deprivation."

Following the initial diagnosis of failure to thrive, TDHS opened a case file on Jessica. On July 13, a TDHS worker purchased more formula for Jessica and gave it to her mother. The case worker returned four days later to find that Rosa Trevino had stopped giving the formula to the baby because she was spitting it up. Together, they took the baby back to Dr. Roberts, whose initial diagnosis upon Jessica's second admission to the hospital was failure to thrive due to inadequate caloric intake, emotional deprivation and recurrent diarrhea of undetermined cause. Laboratory tests disclosed that Jessica had viral meningitis, which Dr. Roberts stated was epidemic in the community at that time. At the time of Jessica's discharge, the final diagnosis was milk and soy gastrointestinal allergy, failure to thrive due to improper feeding, and viral meningitis on admission. Dr. Roberts concluded, based upon his observations during both of Jessica's hospitalizations, that Rosa Trevino was "incompetent" to care for Jessica.

At the beginning of Jessica's second hospital stay, TDHS obtained an exparte order appointing the agency as her temporary managing conservator upon allegation of immediate danger to the child if she was left with the appellants. Appellee, Betty Cox, was placed in charge of Jessica as foster parent on July 18, 1984 during her second hospitalization. The Coxes were licensed foster parents under contract to TDHS. They began to actively care for Jessica while she was still in the hospital. Betty Cox visited Jessica several times a day while she was in the hospital. She saw Rosa Trevino once during Jessica's second hospital stay. She never saw Pablo Rodarte.

Jessica went home from the hospital with the Coxes on August 1, 1984 for what was thought at the time to be a routine period of foster care. Jessica lived with the Coxes continuously until March 2, 1987. The Coxes visited the appellants and took Jessica to see them but she grew up knowing the Coxes as her "momma" and "daddy."

During this time, TDHS continued to monitor the home of the appellants. The appellants were never ceremonially married, and Pablo Rodarte apparently had a wife in Mexico. The appellants' four other children were also placed in foster care. TDHS representatives indicated to the Coxes that it was unlikely that the appellants' home would ever be secure and stable enough to justify Jessica's placement with her natural parents. It is undisputed that Jessica was safe, well cared for and loved in the Coxes' home.

In late 1986, TDHS embarked upon a plan to place Jessica with the appellants in April of 1987. TDHS initiated intensive counseling and support services for the appellants. The Coxes intervened on February 18, 1987, seeking termination of the appellants' parental rights and Jessica's adoption. A few days later, the attorney for Pablo Rodarte wrote the TDHS threatening suit if TDHS did not return Jessica to his client immediately. On the night of March 2, TDHS took the child from the Coxes home, ostensibly for a previously scheduled overnight visit with the appel-

lants. TDHS notified the Coxes the next day that Jessica would not be returned to them and that her placement with the appellants was permanent.

Jessica's weight dropped and her emotional condition deteriorated markedly following her sudden restoration to the appellants. TDHS provided extraordinarily intensive counseling and other support services to the appellants in the ensuing months. The evidence is conflicting regarding the lack of nurturing, hygiene, medical care, supervision and training provided by the appellants. The appellants' household was described by some witnesses as the most squalid of ninety-six apartments. Other witnesses described it as ordinary. After six months, TDHS determined that Jessica had satisfactorily adapted to the appellants and filed its motion for non-suit. The trial court granted the TDHS motion on August 7, 1987, effectively removing TDHS as temporary managing conservator and returning conservatorship to the appellants.

The appellants moved to strike the Coxes' intervention. The motion was denied by the trial court. After a trial by jury on the issue of termination alone, the jury found that both Rosa Trevino and Pablo Rodarte had engaged in conduct which endangered the child and that it would be in the best interest of the child to terminate the appellants' parental rights. The trial court rendered judgment based on the jury's verdict terminating the appellants' parental rights. Following the rendition of judgment, the trial court issued temporary orders for the pendency of the appeal naming the TDHS temporary managing conservator, and directing Jessica's placement with the Coxes with the appellants to have visitation rights subject to TDHS supervision.

In their first two points of error, the appellants maintain that the trial court erred in failing to strike the Coxes' plea in intervention for termination of parental rights and adoption, because the Coxes lacked standing to bring suit, had no justiciable interest, were bound by the issues pleaded by the original parties, raised new and complicated issues which confused the pending action which was near resolution, and were estopped by their relationship to TDHS from asserting right to intervene.

TEX.FAM.CODE ANN. § 11.03(d)(4) (Vernon 1975)[1] provides as follows:

(d) An original suit affecting the parent-child relationship seeking only an adoption, or for termination of the parent-child relationship joined with a petition for adoption, may be brought by:

(4) another adult whom the court determines to have had substantial past contact with the child sufficient to warrant standing to do so.

The appellants argue that foster parents who have contracted with TDHS for the care of the child are acting as the temporary agents of TDHS. Although the appellants acknowledge that the Coxes had possession of Jessica for all of but two months of the first two and one-half years of her life preceding the Coxes' intervention, the appellants stress that the foster care contract reserves the "control" of the child in TDHS.[2] Therefore, in the appellants' view, the Coxes status as mere agents of TDHS can give them no independent standing, for without control of the child, they cannot satisfy the statutory requirement of "substantial past contact with the child sufficient to warrant standing."

Other subsections of 11.03 require "possession and control" of a child in order to bring suit affecting the parent-child relationship. However, section 11.03(d)(4) re-

---

1. All references to section numbers hereinafter are to the TEXAS FAMILY CODE unless otherwise noted.

2. By the terms of the agreement, TDHS retained control of the child. TDHS retained the right to remove the child from appellees' home at its discretion, to arrange for visitation between the child and her natural parents, and to supervise appellees' home. Appellees were obligated to request TDHS' permission to release the child to any person, to allow the child to visit away from home for more than seventy-two hours, to take the child out of the county for more than seventy-two hours, or to take the child out of state. Appellees were required to work cooperatively with the child's case worker and to notify TDHS of any progress, visitors, and all problems relating to the child.

quires only that the petitioner be an adult whom the judge determines "to have had sufficient past contact with the child to warrant standing to do so." We do not agree with the appellants that "substantial contact" necessarily requires control. If the legislature had intended control as requisite to significant contact, it could easily have used the word control in this subsection as it did in other subsections of 11.03. The law transfers the managing conservatorship to TDHS. But the day to day supervision of the child and her activities, and most of the functions ordinarily associated with legal custody, are the responsibility of the foster parents. We believe the legislature intended to give the trial judge the flexibility to deal with those inevitable situations which could not be otherwise anticipated by the drafters. By any definition, the Coxes had "substantial past contact" with Jessica. They had been the child's only parents for the two and one-half years since she was two months old. They were the only mother and father she had known.

The appellants rely on *Mendez v. Brewer*, 626 S.W.2d 498 (Tex.1982), in which the Supreme Court held that foster parents had no justiciable interest to intervene in termination suit brought by TDHS. The *Mendez* court also approved the trial court's refusal to consolidate the foster parents termination suit with that brought by TDHS. The court stated, "[a]ssuming, without deciding, that the foster parents had standing to file such an action, the trial court did not abuse its discretion in refusing to consolidate their suit with the termination proceeding filed by the Department." *Mendez*, 626 S.W.2d at 500. However, *Mendez* has been deprived of its precedential value. Whatever uncertainty existed when *Mendez* was decided, the Legislature eliminated by its subsequent amendment to section 11.03 specifically providing for the trial judge to determine that one with substantial past contact with a child has standing to bring such a suit. The Coxes had a justiciable interest in the subject matter of the suit. The trial court has extensive discretion in determining standing to intervene. *Jones v. English*, 235 S.W.2d 238, 240 (Tex.Civ.App.—San Antonio 1950, writ dism'd).

■ The Coxes' contract with TDHS does not specifically contain, nor should it be construed to contain, a waiver of the foster parents' right to litigate the best interests of a child in which they have a justiciable interest. Nor do we find merit in the appellants' argument that in all cases, foster parents should be prevented from challenging a TDHS decision. The appellants argue that if we give the language of the statute its plain meaning, and interpret section 11.03(d)(4) as giving foster parents the right to bring suit for termination and adoption, then foster parents will have the right to bring suit within perhaps two months of receiving a child. However, the court has ample discretion under the statute to determine that, in such cases, the foster parents' contact with the child would not be sufficient to warrant standing. The FAMILY CODE does not contemplate the continuation of temporary foster care for two and one-half years. It provides for court review of the child's placement no earlier than five and one-half months and no later than seven months from the last hearing. TEX.FAM.CODE ANN. § 18.01(c)(2) (Vernon 1975). It is at least noteworthy that the foster parents are entitled to receive notice and to give evidence at these hearings. Notice obviously contemplates both an opportunity and standing to be heard. *Doe v. State*, 398 A.2d 562, 568, 165 N.J.Super. 392 (1979); TEX. FAM.CODE ANN. § 18.03. In contrast to the hypothetical foster parents in the cases presented by the appellants, the Coxes had served as foster parents for two and one-half years, encouraged to believe that it was extremely improbable that Jessica would be replaced with the appellants. In response to threat of suit from Rodarte's attorney, Jessica was deceptively and suddenly taken from those she knew as her mother and father. While the reunification of a child with her natural parents is, whenever possible, a sound policy, it is not an invariable rule. It would be against public policy to effectively prevent review of an abusive application of even a sound policy.

The trial court did not err in its implied finding that the Coxes had standing to file an original suit pursuant to section 11.03, nor did it abuse its discretion in denying the appellants' motion to strike the Coxes' intervention. The appellants' points of error one and two are overruled.

■ In their third point of error, the appellants maintain the trial court abused its discretion in denying Rodarte's motion for severance of the Coxes' suit for termination of parental rights from their suit for adoption.

Rodarte's pre-trial motion for severance of the two cases was denied by the court. After the verdict, but before entry of judgment, the judge ordered severance of the two matters to be effective as of the date of the first presentment of the motion.

■ A severance is appropriate if a controversy involves two or more separate and distinct causes of action, each of which might constitute a complete lawsuit. *Burleson v. Finley*, 581 S.W.2d 304, 308 (Tex.Civ.App.—Austin 1979, writ ref'd n.r.e.). A termination suit is separate from any other suit affecting the parent-child relationship, and a termination judgment is a final, appealable judgment. *Durham v. Barrow*, 600 S.W.2d 756, 761 (Tex.1980). TEX.FAM.CODE ANN. § 11.13(a) provides that any party may demand a jury trial in a suit affecting the parent-child relationship except in a suit in which adoption is sought. Whether a severance should be granted is within the discretion of the trial judge, and his order will be disturbed only upon a showing of an abuse of discretion. *Hamilton v. Hamilton*, 154 Tex. 511, 280 S.W.2d 588, 591 (1955).

The appellants argue that the court's order retroactively severing the two causes was ineffective to cure the court's error in first overruling the motion for severance. The appellants also contend that TEX.R.CIV.P. 41 prohibits the severance of causes after submission to the jury; therefore, the trial court lacked authority to order a post-submission severance. The appellants argue that combining the foster parents' suit for termination with their suit for adoption increases the probability that

the jury's findings will be unfairly influenced by the relative circumstances of the parties.

Before trial and in response to the appellants' motion in limine, the judge ordered that no mention was to be made during trial of the pending suit for adoption or the future placement of the child, and no pleadings concerning adoption or placement were to be read to the jury. No issues regarding adoption were submitted to the jury. There is nothing in the record to show that a pre-trial severance would have been any more effective than what was actually done to lessen the likelihood of an invidious comparison of the parties' social or financial status. Moreover, the language of TEX.R.CIV.P. 41, which restricts severance to before the time of submission to the jury, speaks only to *misjoined* causes of action. *Johnson v. Hiram Moore, Ltd.*, 763 S.W.2d 496, 502 (Tex. App.—Austin 1989, writ denied). There was no abuse of discretion. The appellants' third point of error is overruled.

■ In their fourth point, the appellants complain that the trial court committed reversible error by overruling their motion to deny the Coxes' request for a jury trial. The appellants rely upon TEX.FAM.CODE ANN. § 11.13(a) which precludes a jury trial in a suit for adoption. We have already observed that the adoption issue was not tried to the jury. Point four is overruled.

■ In their fifth point, the appellants complain of the attorney ad litem's statement to the jury during voir dire that the motivating factor in a custody case frequently has nothing to do with the best interest of the child, but "who gets the welfare check, who gets food stamps, who gets rent supplement, who handles the Medicare and the Medicaid and the other programs." The attorney ad litem told the jury during voir dire that Jessica did not speak Spanish while the appellants were "surrounded by interpreters." They also contend that, in an appeal to ethnic prejudice, the attorney ad litem belittled the Hispanic custom of a married woman retaining her maiden name. In their related

sixth point, the appellants claim the attorney ad litem did not adequately represent the child because of racial, cultural, national, financial, linguistic, and sexual prejudice.

The evidence disclosed that Rosa Trevino and Pablo Rodarte did receive food stamps, live in subsidized housing, and their children were covered by Medicaid. However, as the appellants concede, the natural parents received public assistance whether or not they had possession of Jessica. It was the Coxes who ceased to receive public assistance when they were no longer her foster parents. The attorney ad litem's comments regarding welfare were therefore not necessarily directed at the appellants. The appellants received considerable other support and counseling services from TDHS in an effort to improve their parenting skills. As the Coxes point out, it is a fair deduction from the evidence that at least a portion of this aid was extended to improve the appellants' position at trial, and thereby justify the TDHS decision to return the child to Rodarte and Trevino. Since the issue of TDHS' motivation in returning Jessica to the appellants was raised, an inquiry into the extent and cost of these services and the probability of their continuance after trial was not improper. Given the history of the natural parents' relationship, and the difficulties they experienced in caring for all of their children, the attorney ad litem would have been derelict in his duty to the child if he had not closely examined all matters that would aid the jury in evaluating the viability of the family unit with or without outside support. His uncertainty regarding the appellants' correct names was not unique to him. There was testimony that Rodarte had used several names not related to any custom, including Pablo Rodarte, Anthony Trevino, and Antonio Trevino. This, coupled with evidence that the appellants were never ceremonially married and that Rodarte was married to another woman in Mexico, would be sufficient to raise a genuine doubt as to how to correctly address the appellants.

The appellants raised no objection to the statements of the attorney ad litem during trial. His conduct was challenged first in the appellants' motion for new trial, and later in a motion to remove the attorney ad litem. The trial judge heard testimony on the post-trial motion to remove and concluded that his representation was adequate. The case cited by the appellants, *Sisk v. Duck*, 593 S.W.2d 416 (Tex.Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.), provides no support for the appellants' position. In *Sisk v. Duck*, the Court of Appeals reversed the trial court's judgment denying termination because the attorney ad litem appointed in the county from which the trial was moved did not even appear at trial, and no attorney was appointed in the county where the trial took place. *Id.* at 417. The trial court did not err in overruling the appellants' motion for new trial based upon the challenged conduct. There is no evidence that Jessica was inadequately represented because of the attorney ad litem's bias or prejudice. The appellants' points of error five and six are without merit and are overruled.

■ By their seventh point of error, the appellants urge that the trial court committed reversible error by denying their motion for continuance, because the courts denial of their motion deprived them of adequate time to complete discovery. The appellants complain that they only received notice of the appellees' witnesses shortly before trial. However, the record indicates that although the Coxes' petition in intervention was filed in February, the appellants did not initiate discovery until shortly before the case was called for trial. A trial court's denial of a motion for continuance is not reversible error unless there is a clear abuse of discretion. *Hernandez v. Heldenfels*, 374 S.W.2d 196, 202 (Tex.1963). The appellants have not shown specific harm resulting from the denial of their motion. The trial court did not abuse its discretion in denying the continuance. The appellants' seventh point of error is overruled.

■ In her eighth point of error, Rosa Trevino contends that there is no evidence or insufficient evidence to support the

jury's finding that she knowingly placed, or knowingly allowed, Jessica to remain in conditions or surroundings which endangered the child's physical or emotional well being. In her ninth point, Rosa Trevino argues that the evidence is both legally and factually insufficient to support the jury's finding that she had engaged in conduct that endangered Jessica's physical and emotional well being. Pablo Rodarte's eighth point of error also challenges the legal and factual sufficiency of the evidence to support the jury's finding that he engaged in conduct which endangered Jessica's physical and emotional well being.

We need not address Rosa Trevino's eighth point, because the jury answered the special issue in question in her favor by refusing to find that she had knowingly placed or knowingly allowed Jessica to remain in conditions or surroundings which endangered her emotional or physical well being.

In considering a legal insufficiency or no evidence point, an appellate court must consider only the evidence and the inferences tending to support the challenged finding, and disregard all evidence and inferences to the contrary. If there is any evidence, amounting to more than a scintilla, the no evidence point must be overruled. In addressing a factual insufficiency question, the appellate court must consider and weigh all the evidence and may set aside the finding and order a new trial if it concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

When Jessica first entered the hospital, Dr. Roberts concluded that her condition resulted from inadequate feeding and apparent emotional deprivation. Within a week of Jessica's release, Rosa Trevino was observed still diluting the baby's formula with cow's milk, despite the doctor's warnings to the contrary because of the milk allergy. Maggie DeLeon, Rosa Trevino's sister, testified that Jessica was "very sick" for an entire week before Rosa Trevi-

no sought medical attention for her. Dr. Robert's office manager testified that when Jessica was brought back to the doctor on July 17, 1984, she was "gray ... still ... her eyes were fixed," and that she had never seen another baby brought to the doctor's office who looked so obviously ill. Dr. Roberts again noted that she had lost weight and was unresponsive. Several persons noted that the mother's conduct in the face of the child's suffering was emotionless and unresponsive to the child. The removal to foster care, at one time or another, of all of Rosa Trevino's and Pablo Rodarte's other children circumstantially confirms the couple's lack of minimum parental ability, manifesting itself in substandard treatment of their children.

Two and one-half years later, Jessica was given back to the appellants. Despite the intensive support provided by TDHS and other agencies, the child's physical condition declined. Although she had weighed twenty-seven or twenty-eight pounds in late 1986, one-half year later and several weeks after her abrupt replacement with Trevino and Rodarte, her weight had declined to twenty-five pounds. Once again, the cause was apparently inadequate caloric intake. There is considerable testimony that Jessica looked thin and not as healthy as she had when she lived with the Coxes. The family was on public assistance and was monitored closely by TDHS, yet there was testimony that the family was hungry. Therefore, there is considerable evidence, and it is our reasonable deduction from the evidence that on the two occasions when the appellants had Jessica in their possession, they did not give her enough to eat. But there is evidence that Pablo Rodarte had enough money to keep beer in the refrigerator, to drink regularly with his friends, and to eat at fast food restaurants.

Witnesses commented that when the child was upset, especially following her traumatic removal from her foster parents, the appellants either gave her no attention or emotional support, or they whipped her for crying. The notes of the psychologist who counseled Jessica during this period contain five references to her being

whipped, usually for crying. Her Head-start teacher testified that the appellants sent Jessica to school in dirty clothes and that she found it necessary to bathe her and wash her clothes at school. Other witnesses testified to other occasions when it was obvious that she had not been bathed.

There was testimony that when TDHS returned Jessica to the appellants, they did not give her the medicine that her doctors prescribed and sent home with her. Other testimony recounted the appellants' failure to provide parental supervision, discipline or training for any of the children. One witness told of Rosa Trevino's bizarre, if not dangerous, habit of feeding her children by first chewing their food herself, removing it from her mouth and then feeding it to the children.

Dr. Bakewell, a psychologist under contract to TDHS, recorded in his notes several instances in which the child mentioned being hit by Rosa Trevino. On two occasions, Jessica had suspicious bruises on her body. Although TDHS did not conclude that the bruises were a result of being hit by the appellants, there is sufficient evidence for the jury to have reached that conclusion.

Appellant Pablo Rodarte argues that whatever the state of the case against Rosa Trevino, the evidence is inadequate to support the finding that he engaged in conduct that endangered Jessica's physical or emotional well being. In Rodarte's view, the evidence against him consists of twice striking Rosa Trevino, leaving her bruised, two arrests for DWI, and once threatening Rosa with a knife. None of this conduct he stresses happened in Jessica's presence; most of it occurred before she was born.

However, appellant Rodarte's argument misses the point. At this end of the twentieth century, it is no longer possible, it if ever was, for a man to escape responsibility for the feeding, bathing, cleaning, supervision, discipline, and general nurturing of his children by calling it woman's work. But that is the clear implication of his argument. A father's duty to feed, bathe, and love his children is no less than the mother's. Failure by a parent who is present to prevent abuse or neglect by another, or to render care when it is needed to avoid endangering a child, is sufficient to constitute conduct which justifies termination of the parent's rights. *In the Interest of G.M.*, 580 S.W.2d 65 (Tex. Civ.App.—Amarillo 1979), *rev'd on other grounds*, 596 S.W.2d 846 (Tex.1979); *Shapely v. Texas Department of Human Resources*, 581 S.W.2d 250 (Tex.Civ.App.—El Paso 1979, no writ). The testimony and inferences to be drawn from it suggest that Rodarte failed to do all of these things, and amply supports the jury's finding that he engaged in conduct dangerous to Jessica's well being.

The evidence is both legally and factually sufficient to support the jury's answers. Trevino's point number eight and Rodarte's point number nine are overruled.

By Rodarte's point number nine and Trevino's point number ten, the appellants challenge the legal and factual sufficiency of the evidence to support the jury's finding that the termination of their parental rights was in the best interest of the child.

Section 15.02(2) requires proof that the termination is in the best interest of the child, and this must be proven by clear and convincing evidence independent of any other grounds for termination. *Holley v. Adams*, 544 S.W.2d 367, 373 (Tex.1976). "The mere fact that one of these requirements has been proven is *no evidence* by which the State [the petitioner] can inferentially prove up the remaining requirement." *In the Interest of S.H.A.*, 728 S.W.2d 73, 93 (Tex.App.—Dallas 1987, no writ) (emphasis in original); *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex.1976).

The appellants emphasize that there is a complete lack of direct testimony that the termination of their parental rights would be in Jessica's best interest. On the other hand, Bruce McNellie, the TDHS Program Supervisor, testified that she would get better care from her natural family and be "more loved," and that keeping Jessica

with her natural family "inures" to her benefit.

In arriving at their verdict, the jury is entitled to rely upon reasonable inferences which may be drawn from the evidence. Although there was no direct testimony invoking the phrase, "best interest of the child," there was abundant clear and convincing evidence from which the jury might infer that the termination of the appellants' parental rights was in Jessica's best interest. There was abundant testimony that the appellants failed dangerously in providing for Jessica's physical and emotional needs. During the first two months of her life when she was under the appellants' care, she was endangered by improper and inadequate feeding, emotional deprivation, and the failure to promptly seek medical care. Although Jessica was Rosa Trevino's fifth child, the evidence is little short of conclusive that she was, by any normal measure, incompetent to care for her children. When Jessica was sent back to the appellants for six months as a three year old, there is evidence that she regressed emotionally and physically. Dr. Roberts evaluated the natural mother's parenting skills as follows.

[T]he mother has proved quite incompetent at caring for a child infant, *even under the supervision of the nursing staff in hospital.* She does not know how to hold the baby, is not knowledgeable enough to hold the bottle up so that the milk is at the bottom in the nipple, props the bottle, and has to be told to change the diaper.

(Emphasis ours.)

Later in his records, Dr. Roberts again noted that ". . . the mother has had yet another baby who she is also incompetent to care for." There is plenty of evidence indicating that her parenting skills had hardly improved during the two and one-half years Jessica was with the Coxes.

Far from attempting to compensate for Rosa Trevino's lack of maternal aptitude, there is ample evidence that Rodarte was an irresponsible parent. Rodarte and Trevino were never ceremonially married. Rodarte had a wife and children in Mexico, and had also fathered a child by his wife in Mexico while living with Rosa Trevino. All of their children have been in long term foster care. One still lives with Rosa Trevino's parents. The record shows that Rodarte's separation from the family, frequent absence from home, physical abuse of Rosa, excessive use of alcohol including two DWI convictions, sexual advances to other women including Rosa Trevino's sister, harassment of female employees at work, and failing to provide for his family's needs while spending significant amounts on beer and cigarettes for himself. Rosa Trevino's sister testified, "I told him one time, if you love your little girl, you should stop drinking, and he said he didn't care."

The appellants received extraordinary and intensive assistance from TDHS and other agencies in an effort to aid Jessica in adapting to the appellants and in improving their child care skills. Much of this help is at least inferentially attributable to TDHS' attempt to help the appellants win the lawsuit and justify their decision to return the child to the appellants. The jury could reasonably infer from the record that much of this help would end with the lawsuit. Although the TDHS Program Director testified that it would be in the best interest of the child to remain with the appellants, he conceded on cross-examination that Jessica would not receive more emotional support or intellectual stimulation, would not receive better training or health care, would not develop better physically, and would not be better fed, clothed, or housed if left with the appellants. He admitted that the basis for his opinion that it was in Jessica's best interest to return to Rosa Trevino and Pablo Rodarte was, "the commitment—my personal commitment and the agency's commitment of keeping the family together." The record reflects that shortly after Rodarte's threat of litigation against TDHS, Jessica was deceptively and abruptly wrenched from the foster family and comfortable surroundings where she had thrived for all but two months of her life, and returned, bewildered and heartbroken, to much the same wretched circumstances from which she had been rescued two and one-half years before. Given the

state of the evidence, the jury could easily have discounted the Program Director's direct testimony as an attempt to vindicate a rigid and cruelly misguided application of an ordinarily sound policy.

The finding that Jessica's best interest would be served by the termination of the appellants' parental rights was supported by clear and convincing evidence. The points are overruled.

■ In their tenth and eleventh points respectively, Rodarte and Trevino complain that jury misconduct occurred when some members of the jury overheard a statement made by Jessica's attorney ad litem during a bench conference at the close of the evidence.

Before trial, the court granted Rodarte's motion in limine ordering opposing counsel to refrain from any reference to Pablo Rodarte's legal status in the United States without first obtaining a ruling from the court outside the presence of the jury on the admissibility of such evidence. No evidence of Rodarte's legal status was introduced during the trial. However, at the close of testimony, Tom Senff, attorney ad litem for Jessica, approached the bench, and in a voice overheard by at least some of the jury, told the judge that he was concerned for the child's welfare because the child's father was an illegal alien, would probably be deported, and therefore would be unable to support her. Both counsel for the appellants later acknowledged during the motion for new trial hearing that they believed at the time that the jury could hear Mr. Senff's comments. Counsel for Rosa Trevino testified, "... in the moment that he started to talk I knew that his voice was audible enough for the members of the jury panel to hear, and I quite physically grabbed his elbow and quite bluntly told him to shut up because the jury could hear him." However, neither counsel objected at the time the remarks were made. The matter was first raised in the motion for new trial. Two jurors signed affidavits that they had overheard the remark at the bench.

■ A movant for a new trial based upon jury misconduct must show (1) an overt act of misconduct, (2) that the misconduct was material, and (3) that injury probably resulted. *Fountain v. Ferguson*, 441 S.W.2d 506, 507 (Tex.1969). In *Texas Employers' Insurance Association v. McCaslin*, 159 Tex. 273, 317 S.W.2d 916 (1958), cited by the appellants, the plaintiff, who prevailed at trial, sought out a juror during the trial and attempted to persuade her to "do all you can to help me." Writing for the Supreme Court, Justice Norwell stated:

Rule 327 does not preclude the drawing of logical inferences of prejudice and unfairness from the overt act itself for an action or occurrence may be so highly prejudicial and inimical to fairness of trial that the burden of going forward with proof of harm is met, prima facie at least, by simply showing the improper act and nothing more.

317 S.W.2d at 921.

■ The appellants have cited no case holding that remarks made during a bench conference, and overheard by some jurors, are a communication to the jury constituting jury misconduct comprehended by TEX. R.CIV.P. 327. *McCaslin* involved a communication amounting to an overt attempt to tamper with the jury. In *McCaslin*, the true nature of the contact was unknown until after verdict. In the case at bar, the alleged error occurred at the bench in the presence of opposing counsel. Ordinarily, when one perceives that an error has occurred, a prompt objection must be made or the error is waived. *Zamora v. Romero*, 581 S.W.2d 742, 747 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). The appellants argue that Mr. Senff's statement was so egregious an appeal to racial or ethnic prejudice that no instruction from the court would have been sufficient to cure the error. Therefore, they contend they were irreparably damaged because the error so tainted the proceeding that they were denied their right to a fair trial.

■ The appellants artfully mischaracterize the alleged error as jury misconduct in an effort to avoid the effect of their failure to object. There is no contempora-

neous record of what transpired at the bench conference where the statement was made. At the hearing on the motion for new trial, the appellees' attorneys testified that the purpose of the conference was to argue the admissibility of evidence of Pablo Rodarte's status as an alien. Even if testimony on the matter had been elicited without first securing a ruling from the court, in the absence of any objection, no error would have been preserved. The trial court's grant or denial of a motion in limine is not a ruling on the admissibility of the evidence and does not preserve error. *Hudson v. Smith*, 391 S.W.2d 441, 449 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.); *Romo v. State*, 577 S.W.2d 251, 252 (Tex.Cr.App.1979). The motion in limine adds another step to the introduction of evidence. Counsel remains free to urge the court that the evidence is admissible. *Burdick v. York Oil Company*, 364 S.W.2d 766, 770 (Tex.Civ.App.—San Antonio 1963, writ ref'd n.r.e.). We believe that appellants' counsel were under a duty to object if they believed the motion in limine had been violated so that the trial court might have had the opportunity to cure any error by instruction. While we have found no cases involving overhead bench conferences, there are decisions addressing sidebar remarks by counsel, an analogous question. In *Texas and N.O.R. Co. v. Foster*, 266 S.W.2d 206, 216 (Tex.Civ.App.—Beaumont 1954, writ ref'd n.r.e.), the appellant complained in his motion for new trial of numerous side bar remarks made by opposing counsel throughout the trial. However, no objection was raised at the time to most of the improper comments. The court of appeals found that the clearly improper remarks could have been cured by a proper instruction, and that the failure to object waived error. The jury was aware that Pablo Rodarte had a family in Mexico and had, since living with Rosa Trevino, fathered a child there. They knew that he was not fluent in the English language. Harm, if any, was slight, and could have been cured by instruction. Failure to object waived error.

■ Moreover, even if, for the sake of argument, it is assumed that the chal-lenged statement was a communication contemplated by Tex.R.Civ.P. 327, we do not believe the trial judge reversibly erred in overruling the appellants' motion. The trial judge has considerable latitude in the granting of new trials for jury misconduct, and only upon a clear showing of an abuse of discretion will his decision be reversed. *Flores v. Dosher*, 622 S.W.2d 573 (Tex. 1981). If conflicting evidence is offered at the hearing on the motion for new trial, the trial judge's decision is binding. *Strange v. Treasure City*, 608 S.W.2d 604, 606 (Tex. 1980). The standard of review is also set out in *State v. Wair*, 163 Tex. 69, 351 S.W.2d 878 (1961).

> The trial court's refusal to grant a new trial upon an express or implied finding of no occurrence of jury misconduct is ordinarily binding on the reviewing courts and will be reversed only where a clear abuse of discretion is shown.... The occurrence of jury misconduct is not properly reviewed by the great weight and preponderance test....

*Wair*, 351 S.W.2d at 878.

The trial judge held a hearing on the motion, observed the witnesses and heard their testimony. He was present at the bench conference where the statement was made. He was in the best position to draw the correct conclusion from the evidence. In overruling the motion for new trial, the trial judge found either that no misconduct occurred or that there was an insufficient showing of probable injury to the appellants to require a new trial. We have considered the record as a whole and we cannot agree that the conduct was so blatantly injurious as the appellants now contend. Nor do we construe a statement questioning Rodarte's legal right to remain in the United States as an appeal to racial or ethnic prejudice. The trial judge did not abuse his discretion in overruling the appellants' motion for new trial. Rodarte's tenth point and Trevino's eleventh point are overruled.

■ In Rodarte's twelfth and thirteenth points, and Trevino's thirteenth point, they contend that an interpretation of section

11.03 of the FAMILY CODE that allows foster parents "(1) to oppose the State's reasonable efforts to make it possible for the child to return home, or (2) to bring a private action to terminate the rights of the natural parents of a child whom the State has returned to the care of [its] natural parents" violates the purpose of the Adoption Assistance and Child Welfare Act of 1980 and the Supremacy Clause of the United States Constitution.

The Adoption Assistance and Child Welfare Act sets forth guidelines for a state's continued eligibility to receive federal funds for child welfare services, including foster care. In the Act, child welfare is defined as public social services directed toward the accomplishment of the following purposes:

(A) protecting and promoting the welfare of all children, including handicapped, homeless, dependent, or neglected children;

(B) preventing or remedying, or assisting in the solution of problems which may result in, the neglect, abuse, exploitation, or delinquency of children;

(C) preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems, and preventing breakup of the family where the prevention of child removal is desirable and possible;

(D) restoring to their families children who have been removed, by the provision of services to the child and the families;

(E) placing children in suitable adoptive homes, in cases where restoration to the biological family is not possible or appropriate; and

(F) assuring adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption.

42 U.S.C.A. § 625(a)(1).

The purpose of Title IV–B of the Act is to enable "the United States, through the Secretary, to cooperate with State public welfare agencies in establishing, extending, and strengthening child welfare servic-

es...." 42 U.S.C.A. 620(a). In order to receive federal funds for foster care under Title IV–E, the state "shall have a plan approved by the Secretary [of Health and Human Services] which—(15) ... provides that, in each case, reasonable efforts will be made (A) prior to placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home...." 42 U.S.C.A. § 671(a)(15).

As the appellees stress, the Adoption Assistance Act includes within its definition of child welfare services the "placing [of] children in suitable adoptive homes, in cases where the restoration to the biological families is not possible or appropriate." 42 U.S.C.A. § 625(a)(1)(E). The Act now authorizes payment to those who adopt a child "as a result of a judicial determination to the effect that continuation of residence in the home of a relative would be contrary to the welfare of such child." 42 U.S.C.A. § 673(a)(1)(A)(i) (1985). There was abundant evidence introduced at trial of TDHS's policy to seek reunification of families where appropriate. The Coxes sought a judicial determination to the effect that continuation of residence with the appellants was contrary to the child's welfare. The record reveals the extraordinary efforts expended by TDHS in order to improve the appellants' parenting skills. The process provided the appellants and the child with more than adequate procedural safeguards. They were provided notice, counsel and interpreters, and a trial of the issues.

The TEXAS FAMILY CODE requires a finding of specific acts of misconduct in addition to a finding of the "best interest of the child." TEX.FAM.CODE ANN. § 15.02. These specific acts must be established by "clear and convincing evidence." *Smith v. McLin,* 632 S.W.2d 390, 392 (Tex.App.—Austin 1982, writ ref'd n.r.e.).

The appellants' position would deny judicial review of TDHS's child placement decision to all except the natural parents. We do not interpret the federal statute to require this. Section 11.03 of the TEXAS FAMI-

LY CODE does not conflict with the Adoption Assistance and Child Welfare Act of 1990. These points of error are overruled.

■ In Rodarte's thirteenth and fourteenth points, and Trevino's fourteenth and fifteenth points, they contend that Chapters 11 and 15 of the TEXAS FAMILY CODE violate the constitutionally protected right to integrity of the family insofar as they allow a party other than the state to seek the termination of the natural parents' parental rights.

■ The right to marry, to establish a home and bring up children is a fundamental liberty interest protected by the fourteenth amendment. *Meyer v. State of Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). The natural parents' fundamental liberty interest in the care, custody and management of their child is not lost because they have not been model parents or have lost temporary custody of their child to the state. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). A compelling governmental interest must exist in order to justify state interference with the parent-child relationship. *Citing, In the Interest of S.H.A.,* 728 S.W.2d 73, 91 (Tex. App.—Dallas 1987, no writ). The appellants maintain that there is no compelling state interest that would allow parties other than the state to seek a termination of parental rights.

■ The compelling state interest at stake in parental rights termination proceedings is a *perens patriae* interest in preserving and promoting the welfare of the child. *Santosky,* 455 U.S. at 766, 102 S.Ct. at 1401. It is undoubtedly true that the *parens patriae* interest favors preservation, not severance, of natural familial bonds. *Santosky,* 455 U.S. at 766–67, 102 S.Ct. at 1402. Although favoring the preservation of the natural familial bond, it does not mandate such a result where clear and convincing proof shows that this would not be in the best interest of the child. The determination of what is in the child's best interest requires a fact finding by procedures that promote an accurate determina-

tion of whether the natural parents can and will provide an adequate and stable home.

■ When a conflict arises between the individual's protected interest under the fourteenth amendment and the countervailing compelling state interest, the individual is protected by the due process guarantee of the amendment. But in a case, such as this one, in which due process unquestionably applies, the question remains what process is due. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Due process is flexible and calls for such procedural protections as the particular situation demands. *Id.* The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard.'" *Mathews v. Eldridge,* 424 U.S. 319, 349, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). In *Mathews,* the Supreme Court set out three factors which must be considered in identifying the specific dictates of due process.

> First, the private interest that will be affected by official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335, 96 S.Ct. at 903.

In arguing that the state must show a compelling interest to allow suits for termination by persons other than the state, the appellants confuse the nature of the private, protected interest entitled to due process protection with a procedural characteristic of the Texas process. Clearly, there need not be a compelling state interest for each detail of the process due. In our view, the provision for suits for termination by persons "whom the court deter-

mines to have had substantial past contact with the child sufficient to warrant standing to do so" does nothing to diminish the appellants' due process protection. Many states give standing to persons other than the state to bring termination suits. Foster parents have standing to bring such actions in at least eight other states. *See* Annotation, *Standing of Foster Parent to Seek Termination of Rights of Foster Child's Natural Parents*, 21 A.L.R.4th 522. Texas courts have long recognized that parental custodial rights come within the protection of the due process clauses of the federal and state constitutions. *Pettit v. Engelking*, 260 S.W.2d 613, 616 (Tex.Civ. App.—San Antonio 1953, writ ref'd n.r.e.). "In cases of this kind the question of the fairness of the hearing is always present and has been jealously guarded by the courts." *Id.* The state's right to intervene to protect dependent or neglected children was recognized long before the advent of state supported child welfare agencies. Before the passage of the FAMILY CODE, under the statutes pertaining to dependent and neglected children, private persons customarily initiated suits to declare a child dependent and neglected. TEX.REV.CIV. STAT. art. 2331. Repealed by Acts 1973, 63rd Leg., p. 1458, ch. 543, § 3, eff. Jan. 1, 1974 ("any person who is a resident of the county . . . ."). Common sense argues that the fairness and accuracy of the fact-finding process would be served by granting standing to those among the most intimately concerned with the child's welfare.

The appellants were provided counsel and interpreters, a trial of the issues in which the burden of proof borne by their adversaries was by a clear and convincing evidence standard. The foster parents were required to prove not only the best interests of the child, but also the natural parents' misconduct. In this case, the natural parents were extensively helped by TDHS in an attempt to improve their marginal child rearing capabilities. The appellants' due process rights were not violated by the procedure provided by the TEXAS FAMILY CODE.

The appellants argue that " . . . the state's interest was served by returning [the child] to her home and the child's safety and best interest had been protected by the state's rehabilitative and reunification efforts with the family." TDHS had reached this conclusion. But, TDHS is not the final judge of the best interest of the child. That role belonged to the court which answered the issue adversely to the appellants.

■ Finally, the appellants argue that it is a violation of the separation of powers doctrine for the legislature to allow private parties to initiate actions to terminate parental rights. TDHS was created to provide child welfare services, not to act as a prosecutor's office. We have found no authority for the proposition that the constitution requires such a limitation on the prosecution of termination suits by private parties. The points are overruled.

Rodarte, by his fifteenth point of error, and Trevino, by her sixteenth point, argue that section 11.03(d)(4) of the TEXAS FAMILY CODE violates the constitutionally protected right to the integrity of the family in allowing an adult with "substantial past contact with the child sufficient to warrant standing" to bring a termination action, because such a provision is vague and overbroad. In their respective sixteenth and seventeenth points, the appellants contend that section 11.03(d) violates the constitutionally protected right to the integrity of the family by allowing non-parents to demand a jury trial on the termination issue in a combined suit for termination and adoption. The appellants contend that a fair trial is impossible, because the jury will inevitably compare "the parties' comparative parenting skills or desirability as parents" in deciding the termination issue. The appellants have made no argument nor cited any authority in support of the points, and they have therefore waived the points of error.

The judgment is affirmed.