the State's witnesses regarding what occurred at the lineup. See *Evid.R.* 20.

Alternatively, even if we were to hold there had been error in allowing discovery of that tape recording under the circumstances here, such error need not in every case require a new trial, even if a constitutional principle is implicated. *State v. Macon*, 57 *N.J.* 325, 338 (1971). Our review of the record satisfies us that the eyewitness testimony presented by the State and the positive identification that he made at the post-indictment lineup, in the context of the trial as a whole, made any error harmless beyond a reasonable doubt. It was not clearly capable of producing an unjust result. *R.* 2:10–2; *State v. Macon, supra.*

Affirmed.

IN RE J.P. AND D.P.

Superior Court of New Jersey
Appellate Division

Argued November 5, 1984—Decided January 11, 1985.

Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.

*Richard M. Hluchan* argued the cause for appellants (*Sterns, Herbert & Weinroth,* attorneys; *Richard M. Hluchan,* of counsel and on the brief).

*William H. Mild,* III, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *William H. Mild,* on the brief).

The opinion of the court was delivered by

O'BRIEN, J.A.D.

This is an appeal from a decision by the Director of the Division of Youth & Family Services Management Team of the Department of Human Services (Director) to remove a child from the home of prospective adoptive parents. We affirm.

J. and D.P. (appellants) had been approved by the Division of Youth & Family Services (DYFS) to adopt a child after an extensive review process. *See N.J.A.C.* 10:121A–5.6(a). A child born on January 11, 1982 was placed with appellants for adoption on September 22, 1983. The child was removed from their home on February 1, 1984. The removal was initiated following a call on January 31, 1984 from Mrs. P. to a public health nurse in which she said, according to the nurse, that the child

> started becoming increasingly cranky and demanding. In response to his behavior Mrs. [P.] stated that she 'beat' him and would have to label her actions as child abuse.

She was further quoted by the nurse as admitting "to having a 'rough time' with her husband lately and to feeling isolated and frustrated since [the child's] arrival" and further that she "has been responding to his behavior by hitting." The child's behavior was described by Mrs. P. as "obnoxious." Mrs. P. had been employed by DYFS as a social worker for some ten years. Thus she acknowledged that she knew that it was against

regulations to use corporal punishment on children placed for adoption.

Appellants do not question the right of DYFS to remove a child from the home of prospective adoptive parents under appropriate circumstances but contend that the procedures utilized in the removal of the child from their home were constitutionally impermissible.

Subsequent to the removal of the child from the appellants' home, an "administrative review" hearing was held on February 23, 1984. The hearing was conducted by Virginia Coon, of the Office of Operations Support of DYFS. It was attended by appellants and their attorney, a manager, assistant supervisor and case worker from the Adoption Resource Center (ARC), the public health nurse and her supervisor, as well as a case worker employed by DYFS in another county who had made an investigation of appellants in view of Mrs. P.'s prior employment by DYFS in Mercer County, and lastly, by a deputy attorney general.

After the hearing, Ms. Coon recommended that appellants undergo a psychological assessment in order to

identify the specific strengths and weaknesses of each individual's behavior characteristics that effect [sic] their ability to parent [the child] and effect [sic] the marital relationship as it pertains to the addition of a child to the family.

She further concluded that "the results of this psychological assessment should serve as the basis of the decision as to whether or not the child should be returned to [appellants'] home." She provided that the selection of the psychologist be made by appellants, provided he is properly licensed and that the cost be borne by DYFS.

Thereafter, appellants were examined on March 23, 26 and April 13, 1984, by Dr. John M. Charuk, a clinical psychologist who had previously treated Mrs. P. On the latter visit the child was present. Dr. Charuk recommended that the child be returned to appellants but that they receive some counseling. As a result of this favorable recommendation by Dr. Charuk, Ms. Coon recommended that the child be returned to the appellants'

home for the purpose of adoption placement. She further recommended that the couple receive counseling as suggested by Dr. Charuk. *This decision was rendered on April 27, 1984.*

Thereafter, the administrative hearings' coordinator of the Office of Regulatory and Legislative Affairs, an attorney, reviewed Ms. Coon's recommendation and requested that Dr. John J. Liccardo, a consulting psychiatrist, review the case. Dr. Liccardo reviewed the records, was critical of Dr. Charuk, but concluded with this recommendation:

> Since this is such an important issue for the [appellants], you might want to give them an opportunity for further evaluation which should consist of thorough psychological evaluation (as outlined above) as well as psychiatric evaluations of them as individuals and as a couple. This might help clarify Mrs. [P.'s] apparent ambivalence towards adoption as well as providing more understanding of the motivations of her husband who certainly has been described as the more nurturing parent.

This recommendation was not followed. The final decision of the Director not to return the child was issued on May 31, 1984, from which this appeal has been taken.

■   An adoption agency is legally responsible for a child until the adoption is completed or the child's custody and care are transferred to another agency or person. *N.J.A.C.* 10:121A–3.3(a). After placement, the agency monitors the placement for at least six months, *N.J.A.C.* 10:121A–5.6(n), and may remove the child if his security and well being are impaired or his needs are no longer served by the adoption placement. *N.J.A.C.* 10:121A–5.6(p). Similarly, the prospective parents may at any time request the removal of the child if they no longer want to adopt him. *N.J.A.C.* 10:121A–5.6(p). The prospective parents are permitted to file a complaint for adoption only after the child has been in their home for at least six months, *N.J.S.A.* 9:3–47a. Thus there can be no doubt that the supervisory period is intended to be a trial during which either the agency or the prospective parents can terminate the placement with a minimum of formality. Obviously the polestar is the welfare of the child.

It is fundamental that appellate review of an administrative agency decision is limited to whether that decision could reasonably have been reached on sufficient credible evidence in the record, considering the proofs as a whole with due regard to the opportunity of the one who heard the witnesses to judge of their credibility and with due regard to the agency's expertise. *See Close v. Kordulak Bros.*, 44 *N.J.* 589, 599 (1965).

While appellants do not dispute the scope of our review, they contend that even as prospective adoptive parents they had a constitutionally protected interest in the child placed in their home on a supervisory basis but not yet adopted, and therefore they had a right to procedural due process. In support of their contention, appellants rely upon *C.V.C. v. Superior Court of Sacramento County*, 29 *Cal.App.*3d 909, 106 *Cal.Rptr.* 123 (Ct.App.1973). There the agency cancelled the placement of the child with the prospective adoptive parents without notice and hearing, based upon the alleged alcoholism of the adoptive father. A *habeas corpus* petition was filed by the agency to secure the physical return of the child. The trial court concluded that the agency had not abused its discretion and directed return of the child to the agency. The California Civil Code contained regulations similar to those contained in the New Jersey Administrative Code regarding adoption. The appellate court concluded that the prospective adoptive parents were entitled to procedural due process and that the lack of a hearing on the merits at the agency level and narrowness of the judicial review violated due process demands under the Fourteenth Amendment of the United States Constitution. The court acknowledged that in exceptional circumstances, the welfare of the child might require its removal from the adoptive home before notice and hearing. Nevertheless, the court found that, in the absence of imminent danger to the child, the public interest in terminating placement without prior notice and hearing is outweighed by the "grievous loss" to the prospective parents. Although this broad conclusion has been questioned by the California courts, the California Administrative Code has

been amended to incorporate the requirements set forth in the *C.V.C.* decision. *See Marten v. Thies*, 99 *Cal.App.*3d 161, 170, 160 *Cal.Rptr.* 57, 62 (Ct.App.1979), *cert.* den. 449 *U.S.* 831, 101 *S.Ct.* 99, 66 *L.Ed.*2d 36 (1980). In both cases, the California court recognized that the governmental interest in pre-adoption placement is weighty. It said:

> The statutory system for relinquishment to the agency, for agency placement and agency approval, bespeaks a state policy to promote the child's welfare in derogation of all other values. Civil Code section 224n ... distinctly expresses the state's ongoing interest in terminating an agency placement whenever the child's welfare is endangered. It expresses a legislative design to give the prospective parents only provisional and tentative status until they file an adoption petition. Until then, the licensed adoption agency is entitled to custody and control 'at all times;' the placement may be terminated 'at any time' at the agency's discretion; upon termination the child is to be returned 'promptly' to the physical custody of the agency. These firm legislative expressions were designed to elevate the placement agency's discernment of danger above the interest of the prospective parents. [*C.V.C. v. Superior Ct.*, 29 *Cal.App.*3d 909, 916, 106 *Cal.Rptr.* 123, 128; *Marten v. Thies*, 99 *Cal.App.* 3d 161, 169, 160 *Cal.Rptr.* 57, 61–62.]

We disagree with DYFS's contention that the reasoning of the California court was specifically rejected in *Smith v. Organization of Foster Families for Equality and Reform*, 431 *U.S.* 816, 97 *S.Ct.* 2094, 53 *L.Ed.*2d 14 (1977), since the court there dealt with the relationship between foster parents and the natural parents. Here in New Jersey, in a similar case involving a foster home placement, we concluded that the best interests of the child were not determinative. Further, whether the foster home is a better home or the foster parents are better parents did not control. Rather, we concluded that the controlling question was whether the administrative decision to remove the child from the foster home environment and to restore the permanent relationship with his natural parent is reasonably warranted by the facts contained in the total investigative and social record. *See W.C. v. P.M.*, 155 *N.J.Super.* 555, 565 (App.Div.1978). *C.V.C. v. Superior Court*, as does this case, involved prospective *adoptive* parents working toward a permanent relationship, rather than *foster* parents, an acknowledged temporary relationship.

■ There can be no doubt, as observed by the California court, that the placement of a child for adoption initiates the "closest conceivable counterpart of a relationship of parent and child" and that the enforced removal of the child is a "grievous loss." *C.V.C. v. Superior Ct.*, 106 *Cal.Rptr.* at 128. Nonetheless, we conclude that, even under the expansive decision in *C.V.C. v. Superior Ct.* relied on by appellants, DYFS has comported with adequate due process. Initially there was a sufficient indication of "imminent danger" to warrant the removal of the child prior to a hearing in light of Mrs. P.'s statements to the public health nurse. Contrary to the California case, an administrative review hearing *was* conducted by DYFS at which appellants were present and represented by counsel with a full opportunity for participation. The Director had the discretion to reach a different conclusion from that of the hearing officer to whom the case had been assigned. However, we find some merit in appellants' complaint that the Director ignored the recommendation of the consulting psychiatrist and considered the hearsay opinions of the foster parent, with whom the child had resided both before being placed in appellants' home and again after removal from their home where these reports were not presented at the administrative review hearing provided to appellants. But, with regard to this material not before the hearing officer, the Director specifically stated:

> This final decision is based on the materials and information that were available to the hearing officer. Information obtained subsequent to the hearing served only to confirm the conclusions that were based on pre-hearing data and the findings of the hearing officer.

We observe that it would have been preferable for appellants to have been afforded an opportunity to respond to this confirmatory data and perhaps to have had the examination suggested by Dr. Liccardo. We conclude however that, to the extent that appellants were entitled to any procedural due process, it was accorded to them by DYFS.

As noted, there is a rigorous procedure prior to approval of persons to adopt a child. *N.J.A.C.* 10:121A–5.6(a). In light of

that pre-qualification, the agency should be particularly interested in why their pre-approval procedures did not disclose the matters that dictated abortion of the adoption process in this case. However, we note in the Director's opinion he stated:

> If Mr. and Mrs. [P.] are interested in adopting another child through DYFS, the ARC will prepare and [*sic*] up-dated Adoption Home Study, focused on the issues identified above. The study shall include a complete and comprehensive psychological evaluation of the family and a psychiatric evaluation based on both individual and joint interviews.

Lastly, we note that the child has been placed with other prospective adoptive parents. During the pendency of this appeal that relationship may well have developed to the point where the best interest of the child would not be served by his removal from his new adoptive home in any event. This circumstance was recognized by the California court in *C.V.C. v. Superior Court*, 106 *Cal.Rptr.* at 131, where the court concluded: "The forthcoming abrogation of the superior court order directing the child's return to the county agency will not compel her interim restoration to petitioner's custody" and that "[d]espite cogent reasons for correcting this unfortunate action, the child's welfare remains as the paramount concern."

Affirmed.