625 A.2d 559

THE STATE OF NEW JERSEY IN THE INTEREST
OF L.L., A MINOR CHILD.

Superior Court of New Jersey
Appellate Division

Argued April 21, 1993—Decided June 2, 1993.

Before Judges GAULKIN, HAVEY and STERN.

*Jeffrey M. Advokat* argued the cause for appellant, L.L., Sr. (*Advokat & Rosenberg,* attorneys; *Mr. Advokat* on the brief).

*Susan Scott* argued the cause for respondents Mr. and Mrs. H. (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Ms. Scott* on the brief).

*Peter D. Alvino,* Deputy Attorney General, argued the cause for respondent Division of Youth and Family Services (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Mr. Alvino* on the brief).

*Joel M. Harris,* Deputy Public Defender, Law Guardian for L.L., filed a letter of nonparticipation (*Zulima V. Farber,* Public Advocate).

The opinion of the court was delivered by

HAVEY, J.A.D.

L.L., Sr. appeals from an order entered in the Chancery Division, Family Part, which rejected a plan presented by the Division of Youth and Family Services (Division) for the placement of his son, L.L., pursuant to the Child Placement Review Act (Act), *N.J.S.A.* 30:4C–50 to –65. The central issue is whether the trial court was correct in applying the "best interests" standard in denying the Division's placement plan. We conclude that the "best interests" standard is the appropriate standard in reviewing a placement plan under the provisions of the Act. We therefore affirm the trial court's order. However, we remand for a modification of that order.

On October 24, 1989, L.L., Sr. stabbed his wife to death in the course of a fight.[1] Their child (L.L.), five months old at the time, was placed in the physical custody of the Division pursuant to a voluntary placement agreement executed by L.L., Sr. On the day after the stabbing, the Division placed L.L. in the foster care of Mr. and Mrs. H. (foster parents), who have a natural son, an adopted daughter and two other foster children.

Pursuant to L.L., Sr.'s suggestion, the Division contacted Mr. and Mrs. Doe (fictitious names), L.L., Sr.'s half-brother and sister-in-law who are of Hispanic heritage, and who lived in Panama. In the Division's quest for permanent placement of L.L., it determined that Mr. Doe, a salesman, and Mrs. Doe, a social worker, had a monthly income of approximately $3,000, have a two-year old daughter and maintain a middle-class lifestyle in Panama City. The Does expressed a strong desire to take custody of L.L.

In January 1990, the Division notified the foster parents that it intended to place L.L. with the Does in Panama. In response, the foster parents moved in the Chancery Division to prevent the Division from removing L.L. from their home. At a May 15, 1990 summary hearing, the Division advised the trial court that L.L., Sr. had revoked his voluntary placement agreement and supported the Division's plan to place L.L. with the Does. The Division also presented a home study report prepared by Panamanian social services describing the Does' lifestyle. The trial court rejected the Division's proposal, citing shortcomings in the Panamanian home-study report, the fact that the Does had never seen the child, and the possibility that L.L., Sr. would have access to the child upon release from prison. The Does thereupon flew up from Panama and testified at a subsequent hearing conducted on July 10, 1990. At the hearing, the court granted the foster parents'

---

[1] L.L., Sr. pled guilty to aggravated manslaughter and on January 31, 1991, was sentenced to an eighteen-year term of imprisonment, with no parole ineligibility.

request for extensive discovery and that the Does be examined by the foster parents' privately-retained psychologist.

On October 11, 1990, the Morris County Child Placement Review Board, by a majority vote, approved the Division's proposed placement of L.L. with the Does. *See N.J.S.A.* 30:4C–58. Thereafter, psychological evaluations of the Does and the foster parents were performed by Dr. Sharon Ryan (for the foster parents) and Dr. Robert McCormick (for the Division). L.L., Sr. was evaluated by Dr. Ernesto Perdomo (for the Division). Soon after the evaluations were performed, the trial court granted the foster parents' request for a plenary hearing at which the three experts were examined and cross-examined by counsel, including counsel for the foster parents. The court also received testimony from the foster parents.

Applying a "best interests" standard, the trial court denied the Division's placement plan by order dated May 13, 1991. The court was concerned that if L.L. were placed with the Does, L.L., Sr. would seek to "re-establish his paternity" with L.L. upon release from prison, a prospect the court deemed "a dangerous situation for the child." It also cited the psychological testimony concerning the substantial bonding between L.L. and the foster parents, and the emotional harm L.L. would suffer upon separation from his foster family. Further, the court was not convinced that the Does had had sufficient time to interact with L.L. to enable them to commence parenting. It also expressed some doubt as to whether the Does could invest the time and commitment to visit L.L. in order to establish some relationship with the child prior to his move to Panama. Finally, the court was of the view that the child's Hispanic heritage, while relevant, did not overcome the compelling reasons to continue foster care.

L.L., Sr. and the Division first argue that the trial court erred in granting the foster parents "adversarial" standing in the placement proceedings. They contend that such standing is contrary to the best interests of the child because it may create an impediment to the voluntary consent by natural parents who may not

wish to disclose "intimate details of their personal lives" during an adversarial proceeding, and may harm the child because of the inevitable conflicts such a proceeding will generate between the natural and foster families.

The Act is silent with respect to whether foster parents have standing in placement proceedings. *N.J.S.A.* 30:4C–61c(5) provides that foster parents shall be given notice of a placement review hearing, but does not state that they may demand discovery and participate in the proceedings as adversaries. Under *N.J.S.A.* 30:4C–61b(2), the court may conduct a summary hearing if "[a] party entitled to participate in the proceedings requests [such] a hearing," but does not define the term "party." Moreover, case law in New Jersey and in other jurisdictions is not unanimous on the subject. *See Doe v. State,* 165 *N.J.Super.* 392, 403–06, 398 *A.*2d 562 (App.Div.1979); *W.C. v. P.M.,* 155 *N.J.Super.* 555, 563–66, 383 *A.*2d 125 (App.Div.1978); *New Jersey Div. of Youth & Family Servs. v. Torres,* 185 *N.J.Super.* 234, 245, 447 *A.*2d 1372 (J. & D.R. Ct.1980), *aff'd o.b.,* 185 *N.J.Super.* 182, 447 *A.*2d 1343 (App.Div.1982); *see also* Michael G. Walsh, Annotation, *Standing of Foster Parent to Seek Termination of Rights of Foster Child's Natural Parents,* 21 *A.L.R.*4th 535 (1983).

We need not decide the issue, since even if we were to determine that the trial court improvidently granted "adversarial" standing to the foster parents, common sense and judicial economy dictate that we should not reverse and remand with direction that the proceedings start anew without the foster parents' participation. Such an approach would prolong an already regrettable delay in the disposition of the matter. Moreover, much of the evidence demanded and provided by the foster parents during the hearing, now part of the record, could have been requested by the trial court even without their direct participation as "adversarial" parties. *See N.J.S.A.* 30:4C–61c ("the court may also request or order additional information from any other persons . . . which the court determines have an interest in or information relating to the welfare of the child"). We therefore deem it in the best interests

of all parties that we review the determination by the trial court based on the record presented to us.

L.L., Sr. and the Division contend that the trial court failed to apply the proper standard in reviewing the Division's placement plan. They argue that there was a presumption in favor of placing L.L. with relatives. They further urge that the court was bound by the Division's "administrative" decision to place L.L. with the Does unless it was clearly inimical to the child's welfare, particularly after L.L., Sr. revoked his voluntary placement agreement and concurred with the Division's plan.

The Act declares that it is in the "public interest to afford every child placed outside his home by the Division ... with the opportunity for eventual return to his home or placement in an alternative permanent home." *N.J.S.A.* 30:4C–51. Thus, it is the purpose of the Act "to establish procedures for both administrative and judicial review of each child's placement in order to ensure that such placement *serves the best interest of the child.*" *Ibid.* (emphasis added). To that end, the Act establishes a statutory scheme under which the Division must give prompt notification to the court of the placement of a child outside of his home pursuant to a voluntary agreement. *N.J.S.A.* 30:4C–53. Within fifteen days of receiving such notice, the court must conduct a preliminary review of the appropriateness of the placement. *N.J.S.A.* 30:4C–54. After that review, the Division prepares a plan which includes "[a] statement of the goal for the permanent placement or return home of the child"; "[t]he intermediate objectives relating to the attainment of the goal"; and a statement of the duties and responsibilities of the Division and the child's natural and foster parents. *N.J.S.A.* 30:4C–55.

The Local Child Placement Review Board, on behalf of the Chancery Division, reviews the Division's plan to determine whether "*the best interests of the child* are being served by such placement." *N.J.S.A.* 30:4C–58 (emphasis added). After a hearing, the Board recommends one of three proposals to the Chancery Division: (1) "continued placement of the child outside of the

home is not in the child's best interest[s] and the child should be returned home," *N.J.S.A.* 30:4C–60a; or (2) continued placement outside the home is in the child's best interests on a temporary basis until one of six designated long-term goals is achieved, *N.J.S.A.* 30:4C–60b; or (3) continued placement outside the home on a temporary basis is in the child's best interests, but that the Board has insufficient information to make a recommendation concerning permanent placement. *N.J.S.A.* 30:4C–60c. If the return to the natural parents is not achieved within one year, the Board shall recommend another permanent plan for the child "which shall include permanent placement with a relative through adoption or legal custody or adoption by a nonrelative." *N.J.S.A.* 30:4C–60.

Upon review of the Board's report, the Chancery Division shall either: (1) "[o]rder the return of the child to his parents or legal guardian"; (2) "[o]rder continued placement on a temporary basis until the long-term goal is achieved"; or (3) order continued placement on a temporary basis with direction that the Division provide further information to the court. *N.J.S.A.* 30:4C–61a. If the placement plan does not satisfy the criteria under *N.J.S.A.* 30:4C–58, the trial court shall order the placement plan be modified or that a new plan be developed within thirty days. *N.J.S.A.* 30:4C–61a.

What becomes clear from this statutory scheme is that the "best interests" of the child is the polestar in the implementation of a placement plan. Moreover, while the Act no doubt vests wide discretion in both the Division and the Board to devise and recommend a plan, the trial court is not bound by it. *N.J.S.A.* 30:4C–61a provides that "[u]pon review of the board's report, the family part of the Chancery Division of the Superior Court shall issue an order concerning the child's placement which *it* deems will *best serve the interests of the child.*" (emphasis added). Indeed, the legislative history of the Act makes clear that independent, judicial review of the Division's plan is necessary, because "it is possible for a child to remain in foster care throughout his or

her childhood without ever having [an] official and *impartial* determination [by the court] as to whether the child's *best interests* are being served by such placement." *See Statement to Senate Bill No. 3246* (1977) (emphasis added). Thus, the Chancery Division shall make its own "best interests" analysis based on the entire record, including the recommendations of the Division and the Board, as well as information obtained from other pertinent sources. *See N.J.S.A.* 30:4C–61c.

■ Of course, the "best interests" of the child, in the context of the Act, does not turn on whether the foster home is a "better" home, or the foster parents are "better" parents than the alternative home or family setting recommended by the Division. *See In re J.P.*, 198 *N.J.Super.* 166, 172, 486 *A.2d* 907 (App.Div.1985); *W.C.*, 155 *N.J.Super.* at 565, 383 *A.2d* 125. For example, in *W.C.*, we observed that since foster care is designed as a "temporary palliative" to care for children, foster parents should have no "greater rights than those contemplated by the legislative system." [2] *Ibid.* Such an indulgence toward foster parents based entirely on the superior qualities of their home or social status may create "an impediment to the voluntary consent of an unfortunate parent who cannot care for the children because of health, economic reasons or other infirmities, but who nevertheless has a sincere interest in the welfare of her children and their ultimate return to the family fold." *Id.* at 565–66, 383 *A.2d* 125. *See also In re Guardianship of J.C.*, 129 *N.J.* 1, 21, 608 *A.2d* 1312 (1992) ("Parents, particularly those with limited incomes and unstable housing and work experiences, should be able to turn to the foster-care system without fear of losing their children."). Moreover, under such a simplistic approach, affluence would be the dispositive factor: the option of placing a child with relatives would, in most cases, be foreclosed upon a showing that the foster

---

[2] *W.C.* was decided prior to the passage of the Act. The "legislative system" referred to is *N.J.S.A.* 30:4C–26 and *N.J.S.A.* 30:4C–26.1, which defines the Division's general supervisory powers over foster children. *See W.C.*, 155 *N.J.Super.* at 562, 383 *A.2d* 125.

family had the financial wherewithal to provide a superior physical home or social environment. Such a result frustrates the intent of the Act.

Rather, the inquiry is whether the Division's proposed placement plan satisfies the legislative goals and objectives of the Act by providing a stable, safe and healthy environment for the child considering *all* of the circumstances surrounding the placement. What controls is whether removal from the foster home to an alternative living arrangement is warranted by the facts "contained in the total investigative and social record." *J.P.,* 198 *N.J.Super.* at 172, 486 *A.*2d 907; *see also N.J.S.A.* 30:4C–58 (setting forth eight noninclusive factors for the Board to consider in reviewing the Division's proposed plan).

For example, under *N.J.S.A.* 30:4C–60, the Board shall recommend one of six "long-term goals," including permanent placement with a relative or long-term foster care. Also, as stated, it provides that if return to the child's natural parents has not been achieved within one year, the Board "shall recommend another permanent plan for the child which shall include permanent placement with a relative through adoption or legal custody or adoption by a nonrelative." *N.J.S.A.* 30:4C–60. There is no suggestion in the statute that the Legislature intended that these options be prioritized, or, as the Division argues, that placement with relatives be presumptively favored. Thus, just as the child's return to his parents may not serve the child's best interests, placement with relatives of the parents may be inimical to the well-being of the child if there is a potential the child will be exposed to the very disruptive conduct by the natural parent that triggered the initial placement.

On the other hand, permanent placement with a relative rather than continued foster care may be entirely appropriate where no such danger exists, there has been positive interaction between the relative and child, and other factors, including the child's heritage, dictate that such a placement will accommodate

the long-term needs of the child. The point is that the totality of the circumstances of the placement, not the financial wherewithal of the competing parties, is what should control.

Here, the trial court did not consider whether the foster parents are "better" parents, or offered a "better" home, than the Does. Indeed, it expressly stated that "I didn't compare families here in any sense." Rather, it focused on a variety of pertinent factors in rejecting the Division's plan. It was properly concerned with the possibility that L.L., Sr., upon his release from prison, would attempt to resume a parental role with L.L.[3] Although the Does expressed their intention to adopt L.L., the trial court noted that there was no assurance that, under Panamanian law, they could adopt the child without L.L., Sr.'s consent, or otherwise prevent his assumption of a parental role.

According to Dr. Perdomo, L.L., Sr. had the capacity to "explode under any kind of severe emotional turmoil" which will no doubt conflict with his ability to care for his son. Dr. Perdomo stated that L.L., Sr.'s "emotional urgency dominates his intellectual control powers to the point that under emotional stimulation he may lose total control," and that "he presents a severe pathology in the form of a Personality Disorder that will seriously affect his relation[ship] with his son and with others." Dr. Ryan added that "just the concept of one's father killing one's mother is psychological baggage in and of itself." We are entirely satisfied that the potential of L.L., Sr.'s resumption of his parental role with L.L. was an appropriate factor for the trial court to consider in its review of the Division's proposed placement plan.[4]

Further, this case does not involve a child who has enjoyed an ongoing, positive relationship with a relative who seeks

---

[3] At L.L., Sr.'s criminal sentencing proceeding, his counsel informed the court that L.L., Sr. desired to be reunited with L.L. upon release from prison.

[4] At oral argument it was disclosed that L.L., Sr. is eligible for parole in approximately one year.

or acquiesces in the child's placement. Absent here is any meaningful relationship or interaction between L.L. and the Does. As we understand the record, the Does met briefly with L.L. for the first time while in New Jersey to testify in the placement proceedings. Dr. McCormick, who observed L.L.'s interaction with both the Does and the foster parents, testified that any transfer of the child from the foster parents to the Does should be gradual in order to avoid psychological harm and "disruption" of his present lifestyle. He was also of the view that the Does' brief interaction with L.L. was insufficient to cause any meaningful bonding. Thus, while the blood relationship shared by the Does and L.L. may have been relevant, it was not dispositive in view of the absence of any meaningful interaction between them.

We also agree with the trial court that the substantial bonding between L.L. and the foster parents was a relevant factor in rejecting the Division's plan. Dr. Ryan testified the bonding between the child and the foster parents was deep. She noted that "this child has already had so much significant trauma in his young life. He has tremendous ... psychological scarring to overcome. And this [removal from the foster parents' home] is just adding insult to injury to incur another loss." It was her view that since L.L. has already suffered three separations during his first two years, removal from the foster parents' home would cause permanent "psychological scarring." Dr. McCormick agreed that the child's bonding with the foster parents was significant and that, upon passage of time, there would be an "intensification" of the bonding and a "deeper connection" between the child and the foster parents.

We do not hesitate to conclude that the "serious and enduring emotional or psychological harm" caused by separation of the child from foster parents was an appropriate factor to consider in the present case. *J.C.*, 129 *N.J.* at 19, 608 *A.*2d 1312. It is undisputed that L.L. has established a warm and responsible relationship with the foster family which, to him, constitutes his only family. There is also little question, based on the expert testimony, that removal of the child from that environment would

have a profound and permanent psychological effect upon him. Without placing blame for the inordinate delay in the ultimate disposition of this matter, the two-year bonding with the foster parents during the pendency of this case in the Family Part cannot be ignored, nor can Dr. Ryan's persuasive testimony concerning the probable psychological scarring L.L.'s separation from the foster parents will engender. Finally, while L.L.'s Hispanic heritage was a relevant factor, we conclude that the compelling circumstances cited by the experts outweigh heritage considerations.[5] Thus, in view of the totality of circumstances disclosed by the entire record, we agree with the trial court that the dramatic step of presently removing L.L. from the foster parents and sending him to Panama was not in his best interest.

Although we affirm the May 13, 1991 order denying the Division's placement plan, a remand is necessary for the entry of an order that comports with the Act. As stated, *N.J.S.A.* 30:4C–61a provides that upon review of the local board's recommendations, the Family Part shall issue a placement order: (1) ordering the return of the child to his parents or legal guardian; (2) ordering continued placement on a temporary basis until the long-term goal is achieved; or (3) ordering continued placement on a temporary basis with direction that the Division provide further information concerning its plan. Here, the order simply denied the Division's plan. We therefore remand for the entry of a modified order. The trial court, of course, is not foreclosed from directing that the Division submit a modified or new plan, *see ibid.*, provided that all pertinent new facts are considered, including the effect, if any, of bonding between the child and the foster parents in the two years during the pendency of this appeal.

Affirmed and remanded for entry of an appropriate order.

---

[5] That L.L., Sr. withdrew his voluntary consent to placement, while also relevant, is not dispositive. Once the Division filed its petition with the Family Part, the court had continuing jurisdiction over placement of the child. *See N.J.S.A.* 30:4C–53. L.L., Sr.'s withdrawal of consent did not affect the court's jurisdiction.